UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

_____
                                                        )
IN RE:                                                  )
                                                        )          CHAPTER 11
FREEDOM WIND TUNNEL, LLC            )          CASE NO. 24-10082-CJP
                                                        )
         DEBTOR                                  )
_____)

## MOTION OF CHAPTER 11 EXAMINER FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL THE DEBTOR'S ASSETS, (B) APPROVING AND AUTHORIZNG THE EXPENSE REIMBURSEMENT, (C) SCHEDULING THE RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE, (D) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF FREEDOM WIND TUNNEL LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING AND APPROVING THE EXAMINER'S AND DEBTOR'S PERFORMANCE UNDER THE ASSET PURCHASE AGREEMENT, (C) APPROVING CERTAIN SALE-RELATED CHARGES, AND (D) GRANTING RELATED RELIEF

John O. Desmond, examiner of Freedom Wind Tunnel, LLC ("Examiner"),

respectfully moves this Honorable Court, pursuant to 11 U.S.C. §§ 105, 363, and 365, for

an order (A) approving and authorizing bidding procedures in connection with the sale of

substantially all the assets of Freedom Wind Tunnel LLC ("Debtor"); (B) approving and

authorizing the expense reimbursement, (C) scheduling the related auction and hearing to

consider approval of the sale, (D) approving the form and manner of notice thereof; and

(F) granting related relief; and (II) an order (A) authorizing the sale of substantially all of

the Debtor's assets free and clear of liens, claims and encumbrances and other interests,

(B) authorizing and approving the seller's performance under the asset purchase

agreement, (C) approving certain sale-related charges, and (D) granting related relief.

1

The Examiner intends to sell substantially all the Debtor's assets (the "Assets") to The Wind Tunnel Company, Inc., or its assignee, pursuant to a certain Asset Purchase Agreement dated September 23, 2024 ("Agreement") for $200,000.00 plus the amounts necessary to cure any defaults ("Cure Amounts") arising under certain executory contracts and unexpired leases to be assigned pursuant to the Agreement.  The Examiner estimates that the amount necessary to cure the defaults is approximately $4.475 million. In addition, the under the Agreement, The Wind Tunnel Company, Inc. will assume the liability for all customer deposits and/or prepayments, in the approximate amount of $21,000.00.  Thus, the total amount to be paid under the Agreement for the benefit of the bankruptcy estate is approximately $4.7 million.

The Wind Tunnel Company is a creditor of the Debtor and its principal, Gordon M. Roberts, III, is on the Debtor's board of directors.

The Examiner intends to sell the Assets to the Wind Tunnel Company pursuant to the terms of the Agreement unless a higher or better offer is received on or before the Bid Deadline (as defined in the Bid Procedures).

The Examiner brings this motion to obtain an order approving the Examiner's proposed bidding procedures and the form of the sale notice, to request that the Court schedule a hearing to approve the bidding procedures, and to request the Court schedule a hearing to consider any higher offers, conduct an auction, if necessary, and approve the sale ("Sale Hearing").  At the Sale Hearing, the Examiner will ask the Court to approve the highest and best offer for the Assets, designate any back-up bidders, approve the Agreement, or such amended asset purchase agreement as entered into between the Examiner and the highest bidder (the "Proposed Buyer"), approve the sale free and clear

of all liens, claims, encumbrances, and interests pursuant to 11 U.S.C. § 363(b) and (f),

make a finding that the Proposed Buyer is a good-faith purchaser pursuant to § 363(m),

and approve the payment of certain sale-related charges.

The Assets, which include the Debtor's Patriot Place Lease,[1] all of the Debtor's

personal property and intellectual property, and the Debtor's rights under certain

executory contracts ("Assumed Contracts"), comprise substantially all of the Debtor's

assets.  It is anticipated that the closing of the sale will take place approximately 10

business days following entry of an order approving the sale ("Sale Order").  Under the

Agreement, the closing is estimated to occur no later than December 31, 2024.  However,

this date is subject to change based on the timing of an evidentiary hearing and

subsequent order determining the validity of the Debtor's assumption of the Patriot Place

Lease and the assignment of that lease and the other Assumed Contracts to the Proposed

Buyer.

Given the scope of the Examiner's authority, the Examiner will file a separate

motion jointly with the Debtor seeking to establish certain procedures for assuming and

assigning the Assumed Contracts and determining the Cure Amounts.  The Examiner and

the Debtor have previously filed a motion to assume the Patriot Place Lease, which was

provisionally allowed.

In further support of this motion, the Examiner states:

### Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N).

---

[1] Any capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory basis for relief requested herein are sections 105(a), 363 and 365 of Title 11 of the United States Code; Rules 2002, 6004, 9007, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure; and MLBR 2002-5, 6004-1 and 9013-1.

### Background

4.      The Debtor was formed to develop and operate an indoor skydiving facility at 21 Patriot Place, Foxboro, MA (the "Facility").  In connection with the Facility, the Debtor entered into a long-term lease of land immediately outside the entrance to Gillette Stadium in Patriot Place (the "Lease"), a highly-desirable shopping and entertainment complex.

5.      The Debtor constructed a 12,000 sq. ft., 124-foot tall building at the leased location in order to house the necessary wind tunnel and to provide space for the Debtor's planned related activities, including additional skydiving simulators, and various meeting, training, and entertainment spaces.

6.      For various reasons, the Debtor was unable to complete the construction of the Facility with the financing available to it.

7.      On January 16, 2024, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

8.      After the case filing, the Debtor sought DIP financing to complete the Project but has not been able to obtain the financing it needs.

9.      Given the Debtor's difficulties in continuing the Project and a looming deadline to assume the Patriot Place Lease, the Examiner was appointed to market and

4

sell the Debtor's Assets.  To that end, the Examiner employed Hill View Partners, LLC

as advisors to the Examiner to steward a sale process (the "Broker").

10.     The Broker has been marketing the Assets since early July.

## The Assets

11.     The Assets consist of all of the Debtor's Assets related to the construction

and operation of its business, *viz.* an indoor skydiving facility located at 21 Patriot Place,

Foxboro, MA.  The Assets include the Patriot Place Lease, the building constructed by

the Debtor on the leased premises, all leasehold improvements, the Debtor's machinery

and equipment, all other personal Assets of the Debtor, the Assumed Contracts, and

certain claims and causes of action belonging to the Debtor, including but not limited to

claims against the Debtor's general contractor, Erland Construction, Inc., the Debtor's

landlord, NPP Development, LLC, and any claims, including avoidance claims arising

under the Bankruptcy Code, related to the Assumed Contracts.

12.     The construction of the Debtor's wind tunnel and facility are incomplete

and the Debtor's equipment has not yet been commissioned or tested.

13.     The Assets do not include the Debtor's cash or receivables, any other

claims or causes of action not specifically identified in the Agreement, all leases and

contracts that are not assumed and assigned, and certain stock, employee and tax records.

## Relief Requested

14.     In order to preserve the value of the work done by the Debtor thus far, the

Examiner seeks to sell the Assets free and clear of all liens, claims, encumbrances, and

interests pursuant to § 363(b) and (f).  Any valid liens, claims, encumbrances, or interests

will attach to the sale proceeds in the same order and priority as they currently encumber the Assets.

15.     The Assets shall be sold "AS IS," "WHERE IS," without any representations or warranties, except as provided in the Agreement, and specifically without any transferor liability.

16.     The Examiner requests that the Court approve the proposed form of sale notice, set a hearing to consider approval of the bidding procedures, and set a hearing to consider approval of the sale on the terms and conditions set out in this motion and the attached notice.

**A. Approval of Bidding Procedures and Form of Notice**

17.     The Examiner proposes the form of notice of the sale ("Sale Notice") attached hereto as Exhibit A.

18.     Attached as Exhibit 2 to the Sale Notice is the Examiner's proposed sale and bidding procedures for the Assets (the "Bidding Procedures").

19.     The Examiner respectfully requests the Court approve the form of the Sale Notice.  The Sale Notice provides that the Bidding Procedures and the sale are subject to Bankruptcy Court approval.

20.     The Examiner also requests the Court set a hearing for approval of the Bidding Procedures ("Bidding Procedures Hearing") on or before October 17, 2024 and set a deadline for submission of higher or better offers for the Assets.  A proposed form of order approving the Bidding Procedures is attached hereto as Exhibit B ("Bidding Procedures Order").

21.     Both the Examiner's Sale Notice and the Bidding Procedures include

notice of the objection deadlines and hearing dates relative to both the Bidding

Procedures Hearing and the Sale Hearing. *See* Sale Notice attached as Exhibit A and

Bidding Procedures attached as Exhibit 2 to the Sale Notice.

22.    The Examiner believes that the Bidding Procedures will foster competitive

bidding among potential buyers at the Auction (as defined in the Bidding Procedures) and

will bring the greatest value to the bankruptcy estate.

23.    Key provisions of the Bidding Procedures include:

a.    <u>Participation in Bidding Only by Qualified Bidder:</u>

In order to participate in the bidding for the Assets, along with a bid, any bidder must provide a deposit to the Examiner of two hundred thousand dollars ($200,000) plus 5% of the amount of the cash component of the bid in excess of $200,000 in readily-available good funds and provide Examiner's counsel with a modified version of the Agreement or be bound by the Agreement.  To be a Qualified Bidder, any bidder must also demonstrate that it has the financial wherewithal to close and can provide adequate assurance of future performance under the Patriot Place Lease and the Assumed Contracts.

b.    <u>Hanscom Federal Credit Union's Right to Credit Bid:</u>

Hanscom Federal Credit Union, holder of the first position security interest in the Assets, is deemed a Qualified Bidder and is entitled to credit bid its claim for the Assets.

c.    <u>Terms of Sale Governed by Asset Purchase Agreement</u>

The terms of the sale are governed by the Examiner's Agreement with The Wind Tunnel Company, Inc., attached as Exhibit 1 to the Sale Notice. Any Qualified Bidder will be bound by the terms of the Agreement unless an amended Agreement with all changes clearly marked is provided to the Examiner along with submission of the bid.  The Examiner will consider the terms of any modified Agreement in determining the highest and best offer for the Assets.  The Examiner will designate the bidder with highest and best bid as the Proposed Buyer, and the highest and best bid as the sale price ("Sale Price"), subject to Court approval at the Sale Hearing.

    d.  Due Diligence

Interested parties must complete their due diligence prior to the Bid Deadline.  Inspections of the Assets are available by appointment with the Examiner and his Broker.  Interested parties must contact the Examiner's Broker to schedule a time to view the Assets.

    e.  Designation of Back-Up Bidder

At the conclusion of the Auction, the second highest bidder will be announced as the back-up bidder (the "Back-up Bidder"), subject to confirmation by the Court.  If the Proposed Buyer fails to consummate the sale, the Examiner may sell the Assets to the Back-up Bidder.

    f.  Rejection of All Bids

The Examiner reserves the right to reject any and all bids for the Assets or to decline to sell the Assets to the Back-up Bidder, should the Proposed Buyer fail to close.

24.    A more complete description of the terms of the sale are included in the Agreement and Bidding Procedures attached as Exhibits 1 and 2 to the Sale Notice.

25.    The Examiner reserves the right to modify the proposed Bidding Procedures at or prior to a hearing on this motion, if the Examiner determines that such modification will maximize the value of the Assets.

26.    The Examiner believes, in his sound business judgment, that the Auction will enable him to maximize the value of the Assets and generate funds for the benefit of the Debtor's creditors.  The Auction is proposed in good faith and does not violate public policy.

## B. Approval of Expense Reimbursement

27.    The Examiner and The Wind Tunnel Company have invested substantial time and effort in negotiating the terms of the Agreement.  In addition, The Wind Tunnel Company has invested significant time and effort in determining what will be required to

cure the defaults under the Patriot Place Lease and what will be required to demonstrate

adequate assurance of future performance.  It has incurred significant expenses, including

but not limited to attorney's fees, and will continue to incur these and other expenses as

its pursues the purchase of the Assets and the assignment of the Patriot Place Lease and

Assumed Contracts.

28.     In the event the Assets are sold to a party other than the Wind Tunnel

Company, and the Wind Tunnel Company has not breached or wrongfully terminated the

Agreement, the Examiner has agreed, subject to Court approval, to reimburse The Wind

Tunnel Company, from the proceeds of sale, for its actual out-of-pocket expenses up to

two hundred thousand dollars ($200,000.00) ("Expense Reimbursement").  The Expense

Reimbursement was necessary to induce The Wind Tunnel Company to negotiate the

Agreement that will be used as the benchmark for solicitation of higher or otherwise

better competing bids.

29.     Bankruptcy courts will generally authorize bidding protections such as

expense reimbursement or break-up fees as long as they "enhance" the bidding and are

reasonable in relation to the bidder's efforts and the size of the transaction. *See, e.g., In re*

*ASARCO LLC*, 441 B.R. at 832 (D. Tex. 2010); *In re S.N.A. Nut Co.*, 186 B.R. 98 102

(Bankr. N.D. Ill. 1995).  One such situation is where the bidder is a "stalking horse"—an

initial interested acquirer whose binding offer provides a baseline of value to the estate,

promotes competition, and encourages other bidders to come forward and submit

competitive offers that can be measured against the benchmark established by the

stalking horse bid.

30.     The amount of the Expense Reimbursement, which will be at most 4% of

the total consideration of approximately $4.7 million under the Agreement, is reasonable. *See, e.g., In re Tri-Wire Engineering Solutions, Inc.*, Case No. 21-11322-CJP, Order dated Sept. 15, 2021 (Dkt. No. 31) (Bankr. D. Mass.) (approved 4% break-up fee plus expense reimbursement capped at $150,000).

**C. Sale of Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests**

31.     Pursuant to 11 U.S.C. § 363(f), the Examiner seeks to sell the Assets free and clear of all liens, claims, encumbrances, and interests.  Any valid liens, claims, encumbrances, and interests that exist will attach to the sale proceeds in the same order and priority as they encumber the Assets, subject, if necessary, to later determination by this Court of the validity, extent, and perfection of any such interest.  The Examiner reserves the right to challenge, without limitation, the amount, validity, and perfection of any such claims.

32.     Under § 363(f), estate property may be sold free and clear of any interest of an entity other than the estate if "(1) applicable nonbankruptcy law permits sale of Assets free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such Assets; (4) such interest is in bona fide dispute, or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

33.     Based on the Examiner's knowledge of the Assets, his communications with the Debtor, and his review of the records at the Norfolk County Registry of Deeds and the Massachusetts Secretary of the Commonwealth's Office, there are 4 liens recorded against some or all of the Assets, as follows:

a. A leasehold mortgage relative to the Patriot Place Lease in favor of Hanscom Federal Credit Union ("HFCU") dated April 29, 2021 and recorded on April 30, 2021 in the Norfolk County Registry of Deeds at Book 39344, Page 427.  Based on the Debtor's schedules, the amount owed to HFCU at the time of the case filing was approximately $14,316,332.29;

b. A mechanic's lien in favor of Erland Construction LLC.  Based on the Debtor's schedules, the amount asserted by Erland to be secured by the mechanic's lien is $2,003,041.50;

c. a UCC-1 financing statement in favor of HFCU affecting the Debtor's tangible and intangible property filed with Massachusetts' Secretary of the Commonwealth of Massachusetts and Delaware's Secretary of State; and,

d. a UCC-1 financing statement in favor of HFCU affecting the Debtor's tangible and intangible property filed with Massachusetts' Secretary of the Commonwealth of Massachusetts and Delaware's Secretary of State.

34.     The sale of the Assets free and clear of the interests of HFCU is permissible pursuant to § 363(f)(5).  HFCU could be compelled in a legal or equitable proceeding to accept a money satisfaction of its secured claims.  Specifically, pursuant to a sale through a chapter 11 plan, HFCU could be forced to accept only the allowed amount of its secured claim, as determined under the Bankruptcy Code, or the indubitable equivalent of its claim, so long as it is given the opportunity to credit bid.  11 U.S.C. § 1129(b)(2)(A).  As made clear by the Bidding Procedures, HFCU is entitled to credit bid its claim for the Assets.

11

35.     A sale free and clear of Erland Construction LLC's mechanics lien is

permissible pursuant to § 363(f)(2) and/or (4).  As to § 363(f)(2), the Agreement includes

the assumption of the Patriot Place Lease.  The existence of Erland's mechanic's lien

constitutes a default under the Lease and this default must be cured in order for the lease

to be assigned.  Pursuant to the Agreement, this lien will either be paid at the closing or

bonded off.  The Examiner believes that Erland will consent to the sale and this treatment

of its claim.

36.     Furthermore, Erland's claim is in bona fide dispute so a sale free and clear

of its mechanic's lien can be approved pursuant to § 363(f)(4).  The Debtor's claims

against Erland relative to Erland's work on the project were scheduled at the outset of the

case and the Debtor has frequently noted that the delay in becoming operational was due

in large part to faulty work performed by or under Erland's supervision.  The Agreement

provides for the sale of the Debtor's claims against Erland, further demonstrating that a

bona fide dispute exists.[2]

37.     In addition, two subcontractors, Capone Iron Corporation ("Capone

Iron"), and Time Savers Services Corporation d/b/a Time Savers Construction Services

("Time Savers"), have recorded notices of contracts, complaints, and statements of

account against the property at 21 Patriot Place, Foxboro, MA.  These subcontractors are

seeking to recover from Erland and Erland's lien bond surety pursuant to Mass. Gen.

Laws c. 254, § 12.

38.     Pursuant to Mass. Gen. Laws c. 254, Capone Iron and Time Savers have a

lien against Erland's lien bond, which was recorded on March 2, 2021 in the Norfolk

---

[2] *See*, fn. 2, *supra*.

Registry of Deeds at Book 39079, Page 536.  Erland's surety is Liberty Mutual Insurance

Company ("Liberty Mutual").

39.    Despite the recording of the notices of contracts, complaints, and

statements of account, Capone Iron and Time Savers do not have a lien on the property at

21 Patriot Place, or any of the Debtor's other Assets.

40.    Furthermore, on information and belief, Liberty Mutual's surety

obligations are secured by Erland's assets, not the Debtor's assets.

41.    Nevertheless, even if it were found that Capone Iron and Time Savers had

liens against the Debtor's Assets, the Assets could be sold free and clear of those liens

pursuant to § 363(f)(1), because Massachusetts law would allow the sale of the Assets,

including the Patriot Place Lease, free and clear of any purported mechanic's lien of

Capone Iron or Time Savers, given the existence of the lien bond.

42.    In addition, the Assets can be sold free and clear of any liens of Capone

Iron and Time Savers pursuant to § 363(f)(5) because they could be compelled in a legal

or equitable proceeding to accept a money satisfaction of their claim.

### D.  Payment of Sale-Related Charges and Distribution of Sale Proceeds

43.    The Examiner requests authority to pay certain fees and expenses related

to the sale ("Sale-Related Charges") directly from the sale proceeds.

44.    The Sale-Related Charges include the costs of sale, specifically, the

Expense Reimbursement, and the professional fees and expenses of the Examiner, the

Examiner's counsel, and the Broker.  All such professional fees are to be approved by the

Court after the filing of applications for compensation under 11 U.S.C. § 330.

45.    If any objection to such Sale-Related Charges is sustained, the Examiner

requests authority to pay such fees and expenses as charges under § 506(c).

46.     Pursuant to the Agreement, the Cure Amounts will be paid directly to the respective counterparties under the Assumed Leases and Assumed Contracts by the Proposed Buyer.  The cash component of the purchase price will be paid to the Examiner. The Examiner will hold these funds pending a further order of this Court.

**E.  Hearing to Approve the Sale**

47.     The Examiner requests this Court schedule a hearing to consider approval of the sale of the Assets.

48.     At the hearing, the Examiner will request the Court (a) approve the sale to the Proposed Buyer or the Back-up Bidder pursuant to the Agreement or another substantially similar asset purchase agreement, as applicable, (b) authorize the sale free and clear of all liens, claims, encumbrances, and interests, (c) find that the Proposed Buyer and the Back-up Bidder, is each a good-faith purchaser and is entitled to the protections of § 363(m); and (d) approve the payment of the Sale-Related Charges.

49.     The Examiner requests that the objection and counteroffer deadline be set approximately thirty (30) days after approval of the Bid Procedures and that a Sale Hearing be held as soon thereafter as is convenient to the Court.

**F.  Service of Motion and Notice**

50.     The Examiner will serve this motion on the United States Trustee, the Debtor, the Debtor's 20 largest unsecured creditors, all parties known to assert a lien or interest in the Assets, and any party who has requested notice of the pleadings in this case.

51.     The Examiner proposes to serve the Sale Notice and all attachments on all

creditors listed on the Debtor's creditor matrix, parties who filed notices of appearance in the bankruptcy case, the taxing authorities, and all parties whom the Examiner regards as potential bidders, with copies of this Motion available upon request to the Examiner or his counsel.

WHEREFORE, the Examiner respectfully requests that this Court enter orders:

(a) approving the attached Sale Notice;

(b) approving the Bidding Procedures attached as Exhibit 2 to the Sale Notice;

(c) approving the Expense Reimbursement;

(d) scheduling a hearing on approval of the sale;

(e) after the Sale Hearing, entering an order approving a sale of the Assets free and clear of all liens, claims, encumbrances, and interests;

(f) approving payment of the sale-related charges; and,

(g) granting such further relief as this Court deems just and proper.

Respectfully submitted,
**John O. Desmond, Chapter 11 Examiner in the case of Freedom Wind Tunnel, LLC**
by his counsel,

/s/ Kate E. Nicholson
Kate E. Nicholson (BBO# 674842)
Nicholson Devine LLC
21 Bishop Allen Drive
Cambridge, MA 02139
(857) 600-0508
kate@nicholsondevine.com

Dated: September 23, 2024

**EXHIBIT A**
**(Sale Notice)**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

———————————————————————————  )
                                                                  )
IN RE:                                                        )
                                                                  )          CHAPTER 11
FREEDOM WIND TUNNEL, LLC            )          CASE NO. 24-10082-CJP
                                                                  )
            DEBTOR                                   )
———————————————————————————  )

**NOTICE OF INTENDED PRIVATE SALE AND SALE HEARING FOR
SUBSTANTIALLY ALL OF THE ASSETS OF FREEDOM WIND TUNNEL, LLC**

Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and Fed. R. Bankr. P. 2002(a)(2) and 6004, John O. Desmond, chapter 11 examiner in the case of Freedom Wind Tunnel LLC ("Examiner") intends to sell all of the right, tile and interest of the debtor Freedom Wind Tunnel LLC ("Debtor") in substantially all of the Debtor's assets, including but not limited to the Debtor's lease of 21 Patriot Place, Foxboro, MA ("Assumed Lease"), all of the Debtor's personal property and intellectual property, and the Debtor's rights under certain executory contracts ("Assumed Contracts") (collectively, the "Assets") as further described in the Trustee's proposed asset purchase agreement ("Agreement") with The Wind Tunnel Company, and the proposed bidding procedures ("Bidding Procedures") attached hereto as Exhibit 1 and Exhibit 2, respectively.

In connection with the sale of the Property, the Trustee has filed with the Bankruptcy Court a Motion for an Order (A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially all the Assets of Freedom Wind Tunnel LLC ("Debtor"); (B) Approving and Authorizing the Expense Reimbursement, (C) Scheduling the Related Auction and Hearing to Consider Approval of the Sale, (D) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II) an Order (A) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims and Encumbrances and Other Interests, (B) Authorizing and Approving the Seller's Performance under the Asset Purchase Agreement, (C) Approving Certain Sale-Related Charges, and (D) Granting Related Relief [ECF No. _____] (the "Sale Motion"). **The Bidding Procedures and the sale are subject to Bankruptcy Court approval.**

The sale of the Assets is free and clear of liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code, and will be "AS IS," "WHERE IS," "HOW IS" to the Proposed Buyer.[1]

—————————————
[1]Capitalized terms not defined herein have the same meaning as in the Sale Motion and/or Bidding Procedures.

1

ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT:

- BROKER: Hill View Partners, attention: Arthur Petropoulos (arthur@hillviewps.com; 401-569-9136)

- EXAMINER'S COUNSEL: Kate E. Nicholson (kate@nicholsondevine.com; 857-600-0508)

## **Proposed Sale**

The Examiner has received and accepted an offer to purchase the Assets from The Wind Tunnel Company. The total consideration for the proposed sale of the Assets is approximately four million seven hundred thousand dollars ($4,700,000), comprised of two hundred thousand dollars ($200,000) in cash, four million four hundred and seventy-five thousand dollars ($4,475,000) in Cure Amounts for certain Assumed Contracts and the Assumed Lease paid directly to the counterparties to the Assumed Contracts and Assumed Lease, and approximately twenty-one thousand ($21,000) in assumed liabilities to the Debtor's customers.

## **Qualified Bidders**

PLEASE TAKE FURTHER NOTICE that any potential bidder who wishes to bid on the Assets must be a Qualified Bidder and must submit a Qualified Bid, as defined in the attached Bidding Procedures. Among other requirements, a Qualified Bid must (i) include a Cash Component of at least $450,000; (ii) be accompanied by a deposit of $200,000 plus 5% of the Cash Component in excess of $200,000; (iii) be accompanied by a marked-up version of the Examiner's Agreement, as provided for in the Bidding Procedures, to Examiner's counsel no later than the Bid Deadline (Examiner's counsel: Kate Nicholson; kate@nicholsondevine.com); (iv) be accompanied by documentation demonstrating that the bidder can provide adequate assurance of future performance under the Assumed Lease and Assumed Contracts; and (iv) comply with the other requirements included in the Bidding Procedures.

## **Bidding Procedures**

PLEASE TAKE FURTHER NOTICE that a hearing on the approval of the Bidding Procedures is scheduled for _____ at _____AM/PM before the Honorable Christopher J. Panos, United States Bankruptcy Court for the District of Massachusetts, John W. McCormack Post Office and Courthouse, 5 Post Office Sq., 12th Floor, Courtroom 1, Boston, MA 02109.

Objections to the Bidding Procedures must be filed in writing with the Clerk, U.S. Bankruptcy Court, John W. McCormack Post Office and Courthouse, 5 Post Office Sq., 11th Floor, Boston, MA 02109 on or before _____ (the "Objection Deadline"). A copy of any objection shall be served on (a) counsel to the Examiner, Kate E. Nicholson, Nicholson Devine LLC, 21 Bishop Allen Dr., Cambridge, MA 02139, kate@nicholsondevine.com; (b) counsel to the Debtor, Jesse Redlener, Esq., Ascendant Law Group, 2 Dundee Park Dr., Ste. 102, Andover, MA 01810, jr@ascendantlawgroup.com; (c) counsel to The Wind Tunnel Company, Michael E.

Hastings, Woods Rogers Vanderventer Black PLC, 10 S. Jefferson St., Ste. 1800, Roanoke, VA 24011; and (d) counsel to Richard King, Assistant U.S. Trustee, Justin Kesselman, Esq., 5 Post Office Sq., Ste. 1000, Boston, MA 02109, justin.a.kesselman@usdoj.gov.

Any objection to the Bidding Procedures must state with particularity the grounds for the objection and why the procedures should not be authorized.

## Sale Objection Deadline

PLEASE TAKE FURTHER NOTICE that objections or responses to the Sale Motion, and/or the APA, if any, must be filed in writing with the Clerk, U.S. Bankruptcy Court, John W. McCormack Post Office and Courthouse, 5 Post Office Sq., Ste. 1150, Boston, MA 02109 on or before _____ (the "Objection Deadline").  A copy of any objection shall be served on (a) counsel to the Examiner, Kate E. Nicholson, Nicholson Devine LLC, 21 Bishop Allen Dr., Cambridge, MA 02139, kate@nicholsondevine.com; (b) counsel to the Debtor, Jesse Redlener, Esq., Ascendant Law Group, 2 Dundee Park Dr., Ste. 102, Andover, MA 01810, jr@ascendantlawgroup.com; (c) counsel to The Wind Tunnel Company, Michael E. Hastings, Woods Rogers Vanderventer Black PLC, 10 S. Jefferson St., Ste. 1800, Roanoke, VA 24011; and (d) counsel to Richard King, Assistant U.S. Trustee, Justin Kesselman, Esq., 5 Post Office Sq., Ste. 1000, Boston, MA 02109, justin.a.kesselman@usdoj.gov.

Any objection to the sale must state with particularity the grounds for the objection and why the intended sale should not be authorized.  Any objection to the sale shall be governed by Fed. R. Bankr. P. 9014.

## Sale Hearing

PLEASE TAKE FURTHER NOTICE that the hearing on the Sale Motion is scheduled to take place on _____ at _____(prevailing Eastern Time) (the "Sale Hearing"). The Sale Hearing will be before the Honorable Christopher J. Panos, United States Bankruptcy Court for the District of Massachusetts, John W. McCormack Post Office and Courthouse, 5 Post Office Sq., 12th Floor, Courtroom 1, Boston, MA 02109.

Any party who has filed an objection is expected to be present at the hearing, failing which the objection will be overruled.  The Court may take evidence at the hearing to resolve issues of fact. If no objection to the Sale Motion is timely filed, the Bankruptcy Court, in its discretion, may cancel the scheduled hearing and approve the sale without a hearing.

The Sale Hearing may be adjourned or rescheduled without further notice except by an announcement of the adjourned date at the Sale Hearing.

**Copies of Sale Pleadings**

PLEASE TAKE FURTHER NOTICE that the terms of the proposed sale are more fully
described in the Sale Motion. Copies of the Sale Motion and attachments are available upon
request to the undersigned, which will be emailed upon such request.

**John O. Desmond, Chapter 11 Examiner in the
case of Freedom Wind Tunnel LLC**
by his counsel,

/s/ Kate E. Nicholson
Kate E. Nicholson (BBO# 674842)
Nicholson Devine LLC
21 Bishop Allen Drive
Cambridge, MA 02139
(857) 600-0508
Dated:                              kate@nicholsondevine.com

4

**Exhibit 1**

**(Asset Purchase Agreement)**

**ASSET PURCHASE AGREEMENT**

**dated as of September 23, 2024**

**between**

**THE WIND TUNNEL COMPANY, INC.,**

**as Buyer,**

**and**

**JOHN O. DESMOND, EXAMINER OF FREEDOM WIND TUNNEL, LLC,**

**as Seller**

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS ............................................................................................2

ARTICLE II PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES ..............7
    2.1      Purchase and Sale of Assets. ...................................................................7
    2.2      Excluded Assets. .....................................................................................8
    2.3      Assumed Liabilities. ...............................................................................9
    2.4      Excluded Liabilities. .............................................................................10
    2.5      Obligations in Respect of Cure Amounts. . ............................................10
    2.6      Good Faith Deposit. ..............................................................................10

ARTICLE III CLOSING ..............................................................................................11
    3.1      Closing. .................................................................................................11
    3.2      Closing Payment. ..................................................................................11
    3.3      Deliveries by Seller. .............................................................................11
    3.4      Deliveries by Buyer. .............................................................................12
    3.5      Form of Instruments. ............................................................................12

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER.................................12
    4.1      Organization, Standing. ........................................................................12
    4.2      Power and Authority; Enforceability. ...................................................12
    4.3      Books and Records. ...............................................................................13
    4.4      Real Property. .....................................**Error! Bookmark not defined.**
    4.5      Contracts. ..............................................................................................13
    4.6      Compliance with Law. .......................................**Error! Bookmark not defined.**
    4.7      Hazardous Materials. ............................................................................13
    4.8      Taxes. ....................................................................................................14
    4.9      "AS IS," "WHERE IS" Transaction. ....................................................14

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ..................................16
    5.1      Organization; Standing. ........................................................................16
    5.2      Authority. ..............................................................................................16

ARTICLE VI COVENANTS .........................................................................................16
    6.1      Closing Efforts. .....................................................................................16
    6.2      Access to Information. ..........................................................................16
    6.3      Conduct of the Business Pending the Closing. ....................................16
    6.4      Bankruptcy Actions. .............................................................................17
    6.5      Post-Closing Covenants. .......................................................................18

ARTICLE VII CONDITIONS TO CLOSING ...................................................................19
    7.1      Conditions to Parties' Obligations. ......................................................19
    7.2      Conditions to Buyer's Obligations. ......................................................19
    7.3      Conditions to Seller's Obligations. ......................................................20

i

ARTICLE VIII TERMINATION ........................................................................20
    8.1    Termination. ..............................................................................20
    8.2    Break-Up Fee and Expense Reimbursement. ...................................21
    8.3    Effect of Termination or Breach. ...................................................21

ARTICLE IX POST-CLOSING COVENANTS.................................................22
    9.1    Employees. ..............................................................................22
    9.2    Employee Benefit Plans. ............................................................22
    9.3    Access to Information. ...............................................................22
    9.4    Tax Matters. .............................................................................23
    9.5    Collections on Purchased Assets. .................................................24
    9.6    Treatment of Purchased Assets. ........................**Error! Bookmark not defined.**
    9.7    Transfer Taxes. . .......................................................................24
    9.8    Further Assurances. ...................................................................24

ARTICLE X MISCELLANEOUS ....................................................................24
    10.1    Expenses. ...............................................................................24
    10.2    Amendment. ...........................................................................24
    10.3    Notices. .................................................................................24
    10.4    Waivers. . ...............................................................................25
    10.5    Counterparts and Execution. .......................................................26
    10.6    SUBMISSION TO JURISDICTION. ...........................................26
    10.7    Governing Law. .......................................................................26
    10.8    Binding Nature; Assignment. ......................................................26
    10.9    No Third Party Beneficiaries. . ....................................................26
    10.10    Construction. ..........................................................................26
    10.11    Termination of Representations and Warranties. .............................26
    10.12    Public Announcements. .............................................................27
    10.13    Entire Understanding. ...............................................................27
    10.14    Severability. ...........................................................................27
    10.15    Headings. ...............................................................................27
    10.16    No Liability of Officers and Directors. .........................................27
    10.17    Specific Performance. ...............................................................27

4892-8952-5732, v. 1

**ASSET PURCHASE AGREEMENT**

This ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of the ___ day of September, 2024, by and between The Wind Tunnel Company, Inc., or its assign ("Buyer"), and John Desmond, Esq., solely in his capacity as Examiner ("Seller") of Freedom Wind Tunnel, LLC, the debtor ("Debtor") in bankruptcy case No. 24-10082 (CJP)(the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court").

WHEREAS, Debtor owns a leasehold interest in one parcel of improved real estate, with the address of 21 Patriot Place, Foxboro, MA 02035 (the "Patriot Place Property")(the "Patriot Place Lease"), where it seeks to complete the construction and permitting of a wind tunnel (the "Project") that, if completed, would allow Debtor to operate an indoor skydiving business open to the public (the "Business");

WHEREAS, Debtor owns Personal Property (as hereinafter defined) and other assets and contract rights related to the Patriot Place Property, the Project, and the Business;

WHEREAS, on January 16, 2024, Debtor filed a voluntary petition and commenced the Bankruptcy Case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court;

WHEREAS, on the terms and subject to the conditions set forth herein, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Seller, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, both as hereinafter defined;

WHEREAS, pursuant to the Bankruptcy Court's Orders dated May 22, 2024 [ECF No. 138] and June 4, 2024 [ECF No. 155], the Seller was appointed to serve as Chapter 11 examiner. The Seller was authorized, among other actions, to market the sale of the Debtor's Business and/or assets and, "[a]fter consultation with the Debtor and such other parties as the Examiner deems appropriate, but in the sole discretion of the Examiner, accept one or more offers for the purchase of the Debtor's Assets, or any part of the Debtor's Assets, including the assignment of the Lease, subject in all respects to the approval of the Court". *See* Section 3(c) of the *Order Appointing Examiner* [ECF No. 138]; and

WHEREAS, the Examiner executes this Agreement as Seller, subject to the consideration of higher and better offers pursuant to the Bidding Procedures Order (as defined herein), and approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Accounts Receivable" means all accounts receivable and other receivables of Debtor related to the Project and the Business, and all claims, rights, interests and proceeds related thereto.

"Agreement" means this Asset Purchase Agreement, including all the Exhibits and the Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"Allocation" has the meaning set forth in Section 9.4(a) hereof.

"Assignment and Assumption" has the meaning set forth in Section 3.3(d) hereof.

"Assumed Contracts" has the meaning set forth in Section 2.1(d) hereof.

"Assumed Leases" has the meaning set forth in Section 2.1(a) hereof.

"Assumed Liabilities" has the meaning set forth in Section 2.3 hereof.

"Auction" means the auction, if any, conducted by Seller pursuant to the Bidding Procedures Order for all or substantially all of the Purchased Assets in the event a Qualified Bid (as defined in the Bidding Procedures Order) is timely received prior to the Bid Deadline (as defined in the Bidding Procedures Order).

"Bankruptcy Code" has the meaning set forth in the recitals hereto.

"Bankruptcy Court" has the meaning set forth in the recitals hereto.

"Bidding Procedures" means the bid procedures attached as Exhibit 1 to the Bidding Procedures Order.

"Bidding Procedures Order" means the *Order (A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially all the Debtor's Assets, (B) Approving and Authorizing the Expense Reimbursement, (C) Scheduling the Related Auction and Hearing to Consider Approval of the Sale, (D) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases,(E) Approving Form and Manner of Notice Thereof, and (F) Granting Related Relief* entered by the Bankruptcy Court on [date] [ECF No. __].

"Books and Records" means books and records of Debtor relating to the Business, the Project, the Purchased Assets, or the Assumed Liabilities, including title reports and policies, surveys, environmental records, plans, specifications, inspection and compliance records, and financial records. The Books and Records include any proprietary information in the Debtor's possession belonging to any vendor to the Debtor, including Vertical Wind Tunnel, subject to the same restrictions applicable to the Debtor.

4892-8952-5732, v. 1

"<u>Business</u>" means the Debtor's business as described in the Recitals, but excluding the Excluded Assets.

"<u>Buyer</u>" has the meaning set forth in the preamble hereto.

"<u>Buyer Expenses</u>" means, as of any date of determination, the reasonable fees and out-of-pocket expenses incurred by Buyer on or prior to such date to the extent not previously paid or reimbursed by Seller in connection with the negotiation, preparation and performance of this Agreement and the transactions contemplated hereby, including without limitation attorney fees relating to the investigation and diligence of the legal issues and circumstances arising from the Debtor's bankruptcy filing and the purchase of the Debtor's Assets.

"<u>Cash</u>" means cash and cash equivalents of Debtor (including marketable securities and short-term investments).

"<u>Chapter 11 Case</u>" has the meaning set forth in the recitals hereto.

"<u>Claim</u>" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"<u>Closing</u>" has the meaning set forth in <u>Section 3.1</u> hereof.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 3.1</u> hereof.

"<u>COBRA</u>" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, as reflected in Code Section 4980B and any treasury regulations issued thereunder, and any similar state Laws.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>Contract</u>" means any agreement, license, contract, commitment or other binding arrangement or understanding, whether written or oral, to which the Debtor is a party or is otherwise bound and which Seller is permitted under the Bankruptcy Code and the *Order Appointing Examiner* to assume and assign, including any and all amendments and modifications of any of the foregoing, and any waivers received or granted by Seller with respect to the foregoing.

"<u>Cure Amount</u>" has the meaning set forth in <u>Section 2.5</u> hereof.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by Debtor or any ERISA Affiliate or with respect to which any Debtor or any ERISA Affiliate has any Liability.

"<u>Encumbrance</u>" or "<u>Encumbrances</u>" means any lien (statutory or otherwise), encumbrance, security interest, mortgage, deed of trust, collateral assignment, right of setoff, debt, pledge, levy, charge, encumbrance, encroachment, Tax or Order of any Governmental Authority, option, right of refusal, restriction (whether on transfer, disposition or otherwise), other similar agreement terms tending to limit any right or privilege of Debtor under any Contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust,

3

transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment or binding obligation of any kind whatsoever, whether oral or written, or imposed by any applicable law, equity or otherwise.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with Debtor for purposes of Code § 414.

"Escrow Agent" has the meaning set forth in Section 2.6 hereof.

"Examiner" means John O. Desmond, Esq., solely in his capacity as Examiner pursuant to the Bankruptcy Court's orders dated May 22, 2024 [ECF No. 138] and June 4, 2024 [ECF No. 155], appointing the Examiner and providing the Examiner's authority in the Chapter 11 Case.

"Excluded Assets" has the meaning set forth in Section 2.2 hereof.

"Excluded Liabilities" has the meaning set forth in Section 2.4 hereof.

"Exhibits" means the exhibits hereto.

"Expense Reimbursement" has the meaning set forth in Section 8.2(a) hereof.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Good Faith Deposit" has the meaning set forth in Section 2.6 hereof.

"Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, divisionals, extensions and reexaminations thereof, (ii) trademarks, service marks, designs, trade dress, logos, slogans, trade names, telephone numbers, internet domain names, URLs, websites, email addresses and corporate names, and all applications, registrations and renewals in connection therewith, together with all goodwill associated with any of the foregoing, (iii) copyrights, mask works and copyrightable works, and all applications, registrations and renewals in connection therewith, (iv) trade secrets and confidential business information (including ideas, research and development, know-how, inventions, formulas, compositions, manufacturing and production processes and techniques, technical data, customer and supplier lists, designs, drawings, plans and specifications), and all derivatives of any of the foregoing, (v) computer software (including source code, executable code,

4

data, databases and related documentation) and (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, located at the Patriot Place Property or elsewhere, including all work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, and other and similar items.

"Law" means any law, statute, regulation, code, constitution, ordinance, treaty or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Liability" means any liability, including but not limited to any direct or indirect indebtedness, guaranty, endorsement, warranty, indemnification, product liability, environmental liability, commissions, claim, loss, damage, deficiency, cost, expense, Tax, obligation or responsibility, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted.

"Order" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business by the Debtor in the usual and ordinary course in a manner substantially similar to the manner in which Debtor operated prior to the date hereof.

"Patriot Place Lease" means the leasehold interest of the Real Property located at 21 Patriot Place, Foxboro, MA  02035.

"Patriot Place Property" means the same as the Real Property, located at 21 Patriot Place, Foxboro, MA 02035.

"Person" means any corporation, partnership (including any limited partnership and any limited liability partnership), joint venture, limited liability company, organization, trust, entity, authority or natural person.

"Personal Property" means all furniture, fixtures, trade fixtures, furnishings, machinery and equipment owned by Debtor and, as of the Closing Date, located at the Patriot Place Property or elsewhere, including, without limitation, all proprietary plans, specifications, surveys and drawings related to the Patriot Place Property, the Project, or the Business.

"Petition Date" means January 16, 2024, the date Debtor filed its voluntary petition and commenced the Chapter 11 Case.

"Proceeding" means any claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, liability, damage, suit in equity or at law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or causes of action of whatever kind or character.

5

"Purchase Price" means the total consideration to be paid by Buyer pursuant to Section 3.2 hereof.

"Purchased Assets" has the meaning set forth in Section 2.1 hereof.

"Real Property" means the Patriot Place Property, together with the buildings, improvements, and fixtures located thereon and all appurtenances related thereto.

"Rehired Employees" means each employee of Debtor who accepts an offer of employment by Buyer as described in Section 9.1 hereof.

"Sale Motion" means the *Seller's Motion Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code for: (I) an Order (A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially all the Debtor's Assets; (B) Approving and Authorizing the Expense Reimbursement, (C) Scheduling the Related Auction and Hearing to Consider Approval of the Sale, (D) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (E) Approving Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II) an Order (A) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims and Encumbrances and Other Interests, (B) Authorizing and Approving the Seller's Performance Under the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain of the Debtor's Executory Contracts and Unexpired Leases Related Thereto, and (D) Granting Related Relief* filed with the Bankruptcy Court on [date], 2024 [ECF No. ___].

"Sale Order" means an order substantially in the form attached as Exhibit D to the Sale Motion.

"Schedules" means the schedules attached hereto.

"Seller" has the meaning set forth in the preamble hereto, but for clarity is the Examiner.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, privilege, *ad valorem*, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any affiliated group (or being included (or required to be included) in any Tax Return relating thereto).  For the avoidance of all doubt, all

6

Liabilities for sales, use, transfer, stamp, documentary, registration, conveyance fees, recording charges and other fees and charges incurred in connection with the transactions contemplated under this Agreement, including the sale and purchase of the Purchased Assets pursuant to this Agreement are included within the definition of "Tax" and "Taxes."

"Tax Purchase Price" has the meaning set forth in Section 9.4(a) hereof.

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Person relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Termination Date" has the meaning set forth in Section 8.1(a) hereof.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"Transition Services Agreement" has the meaning set forth in Section 3.3(f) hereof.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state, local or foreign Laws.

## ARTICLE II
## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

2.1     Purchase and Sale of Assets.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, free and clear of all Encumbrances, and Buyer shall purchase, acquire and take assignment and delivery of, for the consideration specified in Article III, all right, title and interest of every kind and nature of Debtor in and to all of the properties, assets and rights (contractual or otherwise) of Debtor and used in the Project or otherwise with respect to the Business as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including all of the following properties, assets and rights, but excluding the Excluded Assets (all of the assets to be sold, assigned, transferred, conveyed and delivered pursuant to this Section 2.1 shall be referred to herein as the "Purchased Assets"):

(a)     the Patriot Place Lease, all equipment leases of Debtor set forth on Schedule 2.1(a), and any other leases identified by Buyer on or before the Closing Date (collectively, the "Assumed Leases");

(b)     all Inventory;

(c)     all Personal Property, including without limitation, all tangible personal property of Debtor at the Patriot Place Property, including but not limited to improvements and all machinery, equipment, computers, servers, information systems, fixtures, computer equipment, telephone systems, furniture, office supplies, production supplies, spare parts and other miscellaneous supplies;

7

(d)    all claims, actions, causes of action, suits, liabilities, obligations, demands, grievances, debts, sums of money, agreements, promises, damages, rights to reimbursement, rights to contribution, rights to indemnification, costs, expenses, attorneys' fees, injunctive relief, disgorgement, restitution, and all other rights and remedies of any type, whether known or unknown, whether in law or in equity, and whether based upon any federal, state, or local law, statute, ordinance, or regulation, or upon any contract, common law source, or any other source, against third parties, including avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law (including all rights and avoidance claims of Debtor arising under chapter 5 of the Bankruptcy Code) identified in Section 75 of the Schedule B filed by the Debtor in the Bankruptcy Case at ECF No. 57-1, against:  (i) Erland Construction Inc., for damages pertaining to schedule delays, breach of contract, defective and nonconforming work, and breach of contract; (ii) NPP Development LLC, NPP Development Holdings LLC, Kraft Group LLC, Kraft Enterprises LLC, and Kraft Family Inc. for willful misconduct and gross negligence;  (iii) National Grid for damages arising from breach of contract; (iv) any causes of action of the Debtor against any counterparty to any of the Assumed Leases and the Assumed Contracts; and (v) any insurance claims arising from the Project, including insurance coverage for any products or services relating to the Project.

(e)    all Intellectual Property owned or licensed by Debtor related to the Project or the Business (including without limitation all of the Intellectual Property set forth on Schedule 2.1(d)), along with all income, royalties, damages, claims, goodwill and payments due or payable to Debtor as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof, or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof, or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in Debtor's possession or control;

(f)    all Contracts of Debtor set forth on Schedule 2.1(f) (collectively, the "Assumed Contracts");

(g)    all Books and Records, or copies thereof, to the extent lawfully transferable;

(h)    all transferable permits, licenses, certifications and approvals from all Governmental Authorities, and the rights to all data and records held by such Governmental Authorities, in each case, of Debtor related to the Patriot Place Property, the Project, or the Business;

(i)    any confidential personnel and medical records pertaining to any Employee of Debtor who accepts Buyer's offer of employment;

(j)    all goodwill as a going concern regarding the Business and all other intangible property of Debtor regarding the Business; and

(k)    all other tangible and intangible assets related to the Project or the Business.

2.2    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the following assets of Debtor are not being sold, assigned, transferred, conveyed or delivered to Buyer

8

hereunder (all of the following are referred to collectively as the "Excluded Assets"), and Buyer shall have no obligations of any kind or nature with respect to or arising from:

(a)     all Cash of Debtor and all Accounts Receivable;

(b)     except for any claim or cause of action of Debtor (i) identified in Section 2.1(d) herein; or (ii) arising out of or relating to any Assumed Leases or Assumed Contracts, all claims, actions, causes of action, suits, liabilities, obligations, demands, grievances, debts, sums of money, agreements, promises, damages, rights to reimbursement, rights to contribution, rights to indemnification, costs, expenses, attorneys' fees, injunctive relief, disgorgement, restitution, and all other rights and remedies of any type, whether known or unknown, whether in law or in equity, and whether based upon any federal, state, or local law, statute, ordinance, or regulation, or upon any contract, common law source, or any other source, against third parties, including avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law (including all rights and avoidance claims of Debtor arising under chapter 5 of the Bankruptcy Code);

(c)     all leases of Debtor except for the Assumed Leases;

(d)     all Contracts of Debtor that are not Assumed Contracts;

(e)     subject to Section 6.2, originals of any Debtor's minute books, stock books and stock certificates;

(f)     subject to Section 6.2, any (i) confidential personnel and medical records pertaining to any Employee of Debtor to whom Buyer does not make an offer of employment or any Employee of Debtor who does not accept Buyer's offer of employment or (ii) other Books and Records that Debtor is required by Law to retain including, without limitation, Tax Returns, taxpayer and other identification numbers, financial statements and corporate or other entity filings;

(g)     all Tax Returns of Debtor and all other books and records relating to Taxes of Debtor, and any claim, right or interest of Debtor in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(h)     all rights under Debtor's insurance policies, including the right to receive the proceeds of that certain Claim No. 52PC000000260550 asserted against Policy No. CIM 5402102-13 issued by Acadia Insurance Company so long as the Debtor provides evidence sufficient to Buyer in its sole discretion that the damage that is the subject of the claim has been corrected, and any right to refunds due with respect to such insurance policies except any policy that is assumed and assigned pursuant to this Agreement; and

(i)     this Agreement and the other Transaction Documents and Debtor's and the bankruptcy estate's rights hereunder and thereunder.

2.3     <u>Assumed Liabilities</u>.   Subject to the terms and conditions set forth in this Agreement, including Section 2.3 hereto, Buyer shall only assume from Debtor and thereafter be

responsible for the payment, performance or discharge of the following Liabilities of Debtor (all such liabilities and obligations assumed pursuant to this <u>Section 2.3</u> shall be referred to herein as the "<u>Assumed Liabilities</u>"):

      (a)    all Liabilities under the Assumed Contracts that arise after the Closing;

      (b)    all Liabilities under the Assumed Leases that arise after the Closing; and

      (c)    the Liabilities listed on <u>Schedule 2.3</u>.

    2.4    <u>Excluded Liabilities</u>.  Except for the Assumed Liabilities, Buyer shall not assume or become liable for the payment or performance of any Liabilities of Debtor of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("<u>Excluded Liabilities</u>").  For the avoidance of doubt, the concept of Excluded Liabilities is intended to be construed as broadly as possibly under applicable Law, including section 363 of the Bankruptcy Code as interpreted, and shall include, without limitation, the following:

      (a)    any Liabilities associated with any Excluded Assets;

      (b)    all Liabilities of Debtor or with respect to the Business for all periods on or prior to Closing, except for any "Cure Amounts" as defined in section 2.5;

      (c)    all Liabilities of Debtor or with respect to the Business for violations of any Legal Requirement;

      (d)    any Liabilities arising under (i) the WARN Act or COBRA with respect to terminations of employment occurring on or prior to the Closing Date or (ii) the Employee Benefit Plans; and

      (e)    all Taxes of the Debtor and any of their respective members, managers, officers, directors, employees, agents or representatives, or liability under and contract or agreement with respect to payment of any Taxes, whether it be Taxes of Debtor or any other party.

    2.5    <u>Obligations in Respect of Cure Amounts</u>.  To the extent that any Assumed Contract or Assumed Lease is subject to a cure pursuant to section 365 of the Bankruptcy Code, at the Closing, any amounts (the "<u>Cure Amount</u>") related to such cure obligations shall be paid by Buyer.

    2.6    <u>Good Faith Deposit</u>.  Upon the execution and delivery of this Agreement by the parties hereto, Buyer shall pay (or shall have paid) Two Hundred Thousand Dollars ($200,000) (the funds deposited into the escrow account, are referred to as the "<u>Good Faith Deposit</u>") by wire transfer of immediately available funds to the escrow account established by Seller's counsel (the "<u>Escrow Agent</u>").  Upon termination of this Agreement by Buyer or Seller pursuant to <u>Section 8.1</u> (other than a termination by Seller pursuant to <u>Section 8.1(d)</u>), and provided that Buyer is not in material breach of its obligations under this Agreement, within three business days following such termination, Buyer and the Seller shall execute joint written instructions to Escrow Agent instructing Escrow Agent to disburse the Good Faith Deposit to Buyer.  If this Agreement is terminated by Seller pursuant to <u>Section 8.1(d)</u>, within three business days following such termination, Buyer and Seller shall execute joint written instructions to Escrow Agent instructing

Escrow Agent to disburse the Good Faith Deposit to Seller; <u>provided</u> that Seller's right to receive the Good Faith Deposit under such circumstances shall be without prejudice to any other rights or remedies the Seller may have as a result of any breach of this Agreement by Buyer.

## ARTICLE III
## CLOSING

3.1    <u>Closing</u>.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "<u>Closing</u>") will take place at a location and time mutually agreeable to Buyer and Seller as soon as practicable after the date on which the conditions set forth in <u>Article III</u> have been satisfied or waived (but no later than three business days thereafter) or on such other date or at such other place and time as Buyer and Seller may mutually determine (the "<u>Closing Date</u>").

3.2    <u>Closing Payment</u>.  At the Closing, Buyer and Seller shall make the following payments and take the following actions:

(a)    Buyer shall pay Two Hundred Thousand Dollars ($200,000), less the Good Faith Deposit, by wire transfer of immediately available funds to an account designated by the Seller in a written notice to Buyer at least two business days prior to the Closing;

(b)    Buyer shall pay the Cure Amounts and shall provide evidence of such payments to the Seller;

(c)    Buyer and the Seller shall execute joint written instructions to Escrow Agent instructing Escrow Agent to disburse the Good Faith Deposit to Seller.

3.3    <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver or procure delivery to Buyer of:

(a)    a certificate signed by Debtor, dated the date of the Closing Date, certifying that the condition specified in <u>Section 7.2(a)</u> has been satisfied as of the Closing;

(b)    originals (or, to the extent originals are not available, copies) of all Assumed Contracts and Assumed Leases (together with all amendments, supplements or modifications thereto);

(c)    one or more bills of sale, in the form attached hereto as <u>Exhibit A</u> conveying in the aggregate all of the owned Personal Property of Debtor included in the Purchased Assets, duly executed by Debtor;

(d)    one or more assignments and assumptions of the Assumed Liabilities, in the form attached hereto as <u>Exhibit B</u> (collectively, the "<u>Assignment and Assumption</u>"), duly executed by Debtor;

(e)    duly executed Intellectual Property assignments (collectively, the "<u>Intellectual Property Assignments</u>") in the forms attached hereto as <u>Exhibit C</u>, each in recordable form to the extent necessary to assign such rights;

11

(f)     a duly executed Transition Services Agreement in the form attached hereto as <u>Exhibit D</u> (the "<u>Transition Services Agreement</u>");

(g)     an Assignment and Assumption Agreement for the Patriot Place Lease in the form attached hereto as <u>Exhibit E</u>;

(h)     such other documents or instruments as are required to be delivered by Seller at the Closing pursuant to the terms hereof or that Buyer reasonably requests prior to the Closing Date to affect the transactions contemplated hereby.

3.4     <u>Deliveries by Buyer</u>.  At the Closing, Buyer will deliver to Seller:

(a)     the Assignment and Assumption duly executed by Buyer;

(b)     the Transition Services Agreement duly executed by Buyer;

(c)     a true, correct, and complete copy of all necessary resolutions authorizing the execution, delivery, and performance of this Agreement by Buyer, and the consummation by Buyer of the transactions contemplated by this Agreement; and

(d)     a certificate signed by Buyer, dated the date of the Closing Date, certifying that the condition specified in <u>Section 7.3(a)</u> has been satisfied as of the Closing.

3.5     <u>Form of Instruments</u>.  To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Buyer and Seller.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER AND DEBTOR

Seller and Debtor represent and warrant, as of the date hereof and the Closing Date, to Buyer as follows:

4.1     <u>Organization, Standing</u>.  Debtor is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and authorized to transact business in the Commonwealth of Massachusetts.  Debtor has all requisite corporate power and authority to conduct the Business, to own or use the properties and assets that it owns or uses, and to perform all its obligations under this Agreement and the transactions contemplated hereunder.

4.2     <u>Power and Authority; Enforceability</u>.  Subject to any necessary authorization from the Bankruptcy Court, Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  All Transaction Documents to which Seller and/or the Debtor is a party have been duly executed and delivered by Seller or Debtor, as appropriate, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Seller or Debtor, as appropriate, after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Seller or Debtor, as appropriate, at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents constitute, or will

12

constitute, as the case may be, the valid and binding agreements of Seller or Debtor, as appropriate, enforceable against Seller or Debtor, as appropriate, in accordance with their terms.

4.3    Title to and Sufficiency of Assets.  The Debtor has good and marketable title to, or interest in (as applicable), all of the Purchased Assets.  Upon entry of the Sale Order, at the Closing, the Seller will be authorized to transfer to the Buyer the Purchased Assets, free and clear of all liens, Claims and Encumbrances to the fullest extent permissible under section 363(f) of the Bankruptcy Code.  The Purchased Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, that Debtor currently uses in connection with the Project and to operate the Business in the manner presently operated by Debtor and include all of the operating assets of Debtor.

4.4    Intentionally blank.

4.5    Contracts.

(a)    Upon entry of the Sale Order and payment or satisfaction of the Cure Amounts, (x) the Assumed Contracts and Assumed Leases shall be deemed valid and binding and in full force and effect and assumed by the Debtor and assigned to the Buyer at Closing, and (y) all defaults and other obligations under the Assumed Contracts and Assumed Leases arising prior to Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Amounts and the non-debtor parties to such contracts shall be forever barred and estopped from asserting or claiming against the Debtor or the Buyer that any additional amounts are due or other defaults exist.

(b)    Upon entry of the Sale Order, payment or satisfaction of the Cure Amounts, and the occurrence of the Closing (i) the non-debtor party to each Assumed Contract and Assumed Lease shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Buyer shall enjoy all of the rights and benefits under each such Assumed Contract and Assumed Lease as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof; and (ii) any provision in any Assumed Contract or Assumed Lease that purports to declare a breach, default or payment right as a result of an assignment or a change of control in respect of the Debtor is unenforceable, and all Assumed Contracts and Assumed Leases shall remain in full force and effect, subject only to payment of the appropriate Cure Amount, if any.

4.6    Hazardous Materials.  Debtor has not, and, to its knowledge, no other person or entity has, generated, stored, manufactured, processed, treated, spilled, released or disposed of any Hazardous Materials (as hereinafter defined) on the Real Property, or transported Hazardous Materials to or from the Real Property in violation of applicable Environmental Laws (as hereinafter defined).  There have been no, and there are no (i) aboveground or underground storage tanks; (ii) polychlorinated biphenyls ("PCBs") or PCB-containing equipment; (iii) asbestos containing materials; (iv) lead based paints; or (v) dry-cleaning or gas station facilities in, on, under, or about the Real Property (or any portion thereof).  Debtor has not received any notice from any Governmental Authority inquiring about, seeking to investigate, or claiming the existence of, any Hazardous Materials on, under or about the Real Property.  As of the date hereof,

13

to Debtor's knowledge, Debtor has made all filings of an environmental nature required for this transaction with all federal, state and local regulatory agencies.  The term "<u>Hazardous Materials</u>" as used herein shall mean any product, substance, chemical, material or waste whose presence, nature, quantity and/or intensity of existence, use, manufacture, processing, treatment, storage, disposal, transportation, spill, release or effect, either by itself or in combination with other materials on or expected to be on the Real Property, is either (a) potentially injurious to public health, safety, welfare, or the environment, or to the Real Property; (b) regulated, monitored, or subject to reporting by any governmental authority; or (c) a basis for potential liability to any governmental agency or a third party under any applicable Environmental Laws.  Without limiting the foregoing, the term "<u>Hazardous Materials</u>" includes, but is not limited to, hydrocarbons, petroleum, gasoline, asbestos containing materials, crude oil or any products or byproducts thereof.  The term "<u>Environmental Laws</u>" as used herein shall mean all federal, state and local laws, ordinances, rules, regulations, codes or orders, including, without limitation, any requirement imposed under any permits, licenses, judgments, decrees, agreements or recorded covenants, conditions, restrictions or easements, the purpose of which is to protect the environment, human health, public safety or welfare, or which pertain to Hazardous Materials.

4.7     <u>Taxes</u>.

(a)     Debtor has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file), with the appropriate taxing authorities, all federal, state and local Tax Returns required to be filed relating to the Business on or prior to the Closing Date.  Such Tax Returns as filed were correct and complete in all material respects.

(b)     All Taxes and Tax liabilities due and owing by or with respect to the income, assets or operations of the Business have been paid in full, except for any such Taxes that are forgiven as part of, or are subject to, the bankruptcy proceedings.

(c)     There are no current Encumbrances on any of the Purchased Assets that arose in connection with any failure (or alleged failure) to pay any Taxes that will survive the bankruptcy proceedings and carryover and become a liability of the Buyer after the Closing Date.

4.8     <u>Intellectual Property</u>.

(a)     Set forth on Schedule 2.1(f) is a list of all of the following items of Intellectual Property owned by Debtor:  (i) patents and applications therefor; (ii) trademarks, service marks, service names or trade names, or registrations or applications for registration thereof, (iii) material unregistered trademarks, service marks, service names or trade names, (iv) copyright registrations, applications for copyright registration and unregistered copyright material to the operation of the Business; (v) domain names and social media accounts ((i)–(v) collectively, the "<u>Owned Intellectual Property</u>") and (vi) a list of all applicable registration information for the Owned Intellectual Property.  Each item of registered Owned Intellectual Property, if any, is in full force and effect.  All necessary registration, maintenance and renewal fees in connection with such registered Owned Intellectual Property have been paid and all necessary documents and certificates in connection with such registered Owned Intellectual Property have been filed with the relevant Governmental Authority for the purpose of perfecting or maintaining such Owned Intellectual Property, including any filings or payments due within thirty (30) days of this

14

Agreement.  None of the registered Owned Intellectual Property is the subject of any challenge pending with any patent or trademark office or received by Seller or Debtor in writing.

(b)     Debtor is the exclusive owner of the entire right, title and interest in and to the Owned Intellectual Property and has a valid license to use the Licensed Intellectual Property in the conduct of the Business.  The Owned Intellectual Property and the Licensed Intellectual Property constitute all the Intellectual Property necessary for the conduct of the Business.  The Debtor has taken commercially reasonable measures to protect the Owned Intellectual Property and to maintain the Owned Intellectual Property.

(c)     To the Knowledge of the Debtor and Seller, the use of any Owned or Licensed Intellectual Property by Debtor has not and does not conflict with, infringe upon or violate any rights of any third party.  The Debtor and Seller have not received in the past five (5) years any notice, charge, claim or other assertion of any present, impending or threatened infringement by, or misappropriation of, or conflict with any Owned or Licensed Intellectual Property of any third party.  To the Knowledge of the Seller and Debtor, no third party is infringing upon or misappropriating any Owned Intellectual Property.  The consummation of the transactions contemplated by this Agreement will not result with the loss, forfeiture, or impairment of any of the Owned or Licensed Intellectual Property or require any additional royalties or other fees to be paid in connection therewith.

4.9     <u>"AS IS," "WHERE IS" Transaction.</u>  Buyer hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement, neither Debtor nor Seller make any representations or warranties whatsoever, express or implied, with respect to any matter relating to the Project, the Business or the Purchased Assets, including, without limitation, income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property comprising a part of the Purchased Assets or which is the subject of any Assumed Contract or Assumed Lease, the environmental condition or other matter relating to the physical condition of any real property or improvements that are part of the Purchased Assets, the zoning of any such real property or improvements, the value or transferability of the Purchased Assets (or any portion thereof), the terms, amount, validity or enforceability of any Assumed Liabilities, the merchantability or fitness of the Purchased Assets (or any portion thereof for any particular purpose).  Accordingly, except as otherwise expressly provided in this Agreement, Buyer will accept the Purchased Assets at the Closing AS IS, WHERE IS and WITH ALL FAULTS.

4.10    <u>Disclosure</u>.  No representation or warranty or other statement made by Seller or Debtor in this Agreement, the Exhibits, the Schedules, any other documents delivered pursuant to this Agreement, or otherwise in connection with the transactions contemplated by this Agreement contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.  Seller has no knowledge of any fact that has not been disclosed to the Buyer that has application to Seller or Debtor (other than general economic or industry conditions) and that may materially adversely affect the Purchased Assets, Business, or Project that has not been set forth in this Agreement, the Exhibits, or the Schedules.

15

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

5.1     <u>Organization; Standing</u>.  Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Maryland.

5.2     <u>Authority</u>.   Buyer has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  All Transaction Documents to which Buyer is a party have been duly executed and delivered by Buyer, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Buyer after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Buyer at or prior to the Closing, and all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Buyer, enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

## ARTICLE VI
## COVENANTS

6.1     <u>Closing Efforts</u>.  Prior to Closing, Buyer, Debtor and Seller shall use commercially reasonable efforts to (i) obtain all material consents and approvals of all Governmental Authorities and all other Persons, if any, required to be obtained by Buyer, Debtor, and/or Seller to effect the transactions contemplated by this Agreement and (b) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law and this Agreement, to consummate and make effective in an expeditious manner the transactions contemplated hereby.

6.2     <u>Access to Information</u>.  Seller and Debtor agree that, prior to the Closing Date, Buyer and its representatives shall, upon reasonable advance notice and so long as such access does not unreasonably interfere with the business operations of Debtor, have reasonable access during normal business hours to Debtor's premises, including, without limitation, the Real Property, and shall be entitled to make such investigation of the properties, businesses and operations of Debtor and such examination of the Books and Records and financial condition of Debtor as it reasonably requests and to make extracts and copies to the extent necessary of the Books and Records; <u>provided</u>, that no investigation pursuant to this <u>Section 6.2</u> shall affect any liability for, or otherwise diminish, modify or affect, any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the transactions contemplated by this Agreement.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Debtor to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Debtor is bound.

6.3     <u>Conduct of the Business Pending the Closing</u>.  Subject to any obligations as a debtor-in-possession under the Bankruptcy Code, and except as required by Law, as contemplated

16

by this Agreement, or with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), from the date hereof until the Closing Date, Debtor and Examiner:

(a) shall not sell, transfer, abandon, encumber, permit to lapse or otherwise dispose of any of the Purchased Assets;

(b) shall conduct the Business in the Ordinary Course of Business;

(c) shall use commercially reasonable efforts to preserve intact the Business to keep available the services of its current employees and agents and to maintain its relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations;

(d) shall not enter into any Contracts without prior written authorization of Buyer;

(e) shall maintain in full force and effect insurance policies covering Debtor and its properties, assets and businesses in a form and amount consistent with past practice; and

(f) shall not make or change any election relating to Taxes, amend any Tax Return, enter into any closing agreement with respect to Taxes, settle any Tax claim or assessment relating to Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or take any other similar action relating to Taxes.

6.4     Bankruptcy Actions.

(a) Seller shall use its commercially reasonable efforts to: (i) ensure that the Bidding Procedures Order is entered by no later than October 21, 2024, (ii) ensure that Bids are due no later than November 22, 2024, (iii) ensure that the Auction, if any, for the sale of the Purchased Assets, on terms and conditions substantially the same in all material respects to this Agreement and in accordance with the procedures set forth in the Bidding Procedures Order, shall be held no later than December 5, 2024, (iv) ensure that the Sale Order is entered by no later than December 10, 2024 and (v) consummate the Closing as soon as practicable after the approval of the Sale Order and no later than the earlier of (x) 10 business days following the entry of the Sale Order or (y) one day before the Termination Date.

(b) Buyer agrees to promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Buyer of its obligations under this Agreement and the Transaction Documents and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

(c) Buyer shall be responsible for providing evidence and argument in support of the Sale Order in order to establish Buyer's ability to provide "adequate assurance of future performance" (within the meaning of section 365(f)(2)(B) of the Bankruptcy Code) of any

17

Assumed Contract or Assumed Lease.  Debtor and Seller agree to use commercially reasonable efforts to cooperate with Buyer in the presentation of such evidence and argument.

(d)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "Competing Bid").  From the date hereof (and any prior time) and until the transaction contemplated by this Agreement is consummated, Seller is permitted to cause its representatives to initiate contact with any Person in connection with, or solicit or encourage submission of, a Qualifying Bid (as defined in the Bidding Procedures Order) to be submitted at the Auction by any Person.  In addition, Seller shall, in an effort to encourage submission of Qualifying Bids at the Auction, respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and the assets of Debtor to prospective purchasers.

6.5     Post-Closing Covenants

(a)     Within thirty (30) days after the Closing Date (or such later time as Buyer may agree to in writing), Debtor shall discontinue all use of Debtor's corporate name and trade names (or any similar names) (collectively, the "Trade Names").  Debtor agrees that it shall not conduct any business after the Closing under its Trade Names (or any similar name) or under any trademarks or service marks included in the Purchased Assets (or any trademarks or service marks similar thereto) (collectively with the Trade Names, the "Prohibited Marks"). Debtor shall, as soon as practicable after the Closing, file appropriate amendments to its organizational documents and file with all applicable authorities and in all applicable jurisdictions all documentation that is necessary to change the name of Debtor to a name substantially dissimilar to its name as of the Closing and otherwise remove all Prohibited Marks from any corporate entity names, DBAs, or assumed names of Debtor. For clarity, except as expressly provided in this Section 6.5(a), following the Closing, Debtor will not register or use any trademarks, service marks, corporate entity names, DBAs, assumed names, domain names, or social media accounts/handles that comprise or incorporate the Prohibited Marks or any similar name.

(b)     After the Closing, Debtor and Seller will reasonably cooperate with Buyer in its efforts to continue and maintain for the benefit of Buyer those business relationships of Debtor existing prior to the Closing and relating to the Business, including relationships with distributors, employees, regulatory authorities, licensors, customers, suppliers, and others.

(c)     Debtor and Seller shall cooperate with and assist Buyer and its representatives to provide an efficient transfer of control of the Purchased Assets and to avoid any undue interruption in the activities and operations of the Business following the Closing. Debtor and Seller shall not request that any utilities be disconnected until Buyer shall have established an account for the utilities associated with the Business in Buyer's own name or ninety (90) days after Closing, whichever occurs first. Debtor shall provide reasonable assistance in transferring to Buyer any utilities of the Business. Buyer shall be liable to Debtor for the utility payments for any utilities maintained by Debtor on behalf of the Business and at Buyer's request following the Closing. In the event service of any utilities cannot be transferred in the name of Buyer as of the Closing Date, the bills shall be prorated as of the Closing Date as between Debtor and Buyer.

18

(d)     The parties will cooperate reasonably with each other and with their respective agents and representatives in connection with any steps required to be taken in order to discharge their respective obligations under this Agreement, and will (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the transactions contemplated by this Agreement.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     <u>Conditions to Parties' Obligations</u>.    The obligations of Buyer and Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer and Seller in whole or in part to the extent permitted by applicable Law):

(a)     <u>Governmental Approvals</u>.    All terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

(b)     <u>No Order or Proceeding</u>.    No Order shall be issued by any Governmental Authority enjoining, restraining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.

(c)     <u>Bankruptcy Condition</u>.    The Sale Order shall have been entered on the docket by the Clerk of the Bankruptcy Court.

7.2     <u>Conditions to Buyer's Obligations</u>.    The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)     <u>Accuracy of Representations and Warranties</u>.    Each of the representations and warranties of Seller and Debtor contained herein shall be true and correct in all material respects on and as of the Closing Date.

(b)     <u>Assumption of all Assumed Contracts and Assumed Leases</u>.    Provided the Cure Amounts have been paid by the Buyer, the Debtor shall have assumed all the Assumed Contracts and Assumed Leases and obtained Bankruptcy Court approval of the assumption and assignment of all Assumed Contracts and Assumed Leases.

(c) <u>Performance of Covenants</u>.    Seller and Debtor shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Seller and Debtor on or prior to the Closing Date.

(d)     <u>Closing Deliveries</u>.    Seller and Buyer shall have delivered, or caused to be delivered, to Buyer all of the items set forth in <u>Section 3.3</u>.

19

(e)  <u>Dismissal or Conversion of the Chapter 11 Case</u>.  The Chapter 11 Case shall not have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

(f)  <u>Financing</u>.  Buyer shall have obtained financing sufficient in terms of amount and conditions, in its sole discretion, to acquire the Purchased Assets, subject to the Seller's right to terminate in <u>Section 8.1(h)</u>.

7.3  <u>Conditions to Seller's Obligations</u>.  The obligation of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)  <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Buyer contained herein shall be true and correct in all material respects on and as of the Closing Date.

(b)  <u>Performance of Covenants</u>.  Buyer shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)  <u>Consideration</u>.  Buyer shall have made the payments specified in <u>Section 3.2</u>.

(d)  <u>Closing Deliveries</u>.  Buyer shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 3.4</u>.

**ARTICLE VIII**
**TERMINATION**

8.1  <u>Termination</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)  by either Buyer or Seller, if the Closing shall not have occurred by the close of business on January 31, 2025 (the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that, if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order and if all other conditions to the respective obligations of the parties to close hereunder that are capable of being fulfilled by the Termination Date shall have been so fulfilled or waived, then no party may terminate this Agreement prior to March 31, 2025; <u>provided</u>, <u>further</u>, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer, Debtor, or Seller, then the breaching party may not terminate this Agreement pursuant to this <u>Section 8.1(a)</u>;

(b)  by mutual written agreement of Buyer and Seller;

(c)  by either Buyer or Seller, if there shall be in effect a Final Order enjoining, restraining or otherwise prohibiting the consummation of the transactions contemplated hereby, <u>provided</u> that Seller shall not be entitled to terminate under this subsection if Seller sought, or advocated in favor of, such a Final Order;

20

(d)    by either Buyer or Seller, if there shall have been a material breach of any of the representations, warranties, covenants or agreements set forth in this Agreement on the part of the other party, which breach is not cured within the earlier of (x) 10 days following written notice to the party committing such breach or (y) one day before the Termination Date or which breach, by its nature, cannot be cured prior to the Closing; provided that neither Buyer nor Seller may terminate this Agreement pursuant to this Section 8.1(d) if such party is then in material breach of any representation, warranty, covenant or agreement contained herein;

(e)    by either Buyer or Seller, if the Bankruptcy Court shall enter an Order approving a Competing Bid, subject to the limitations set forth in the Bidding Procedures Order and subject to Buyer's right to payment of the Expense Reimbursement in accordance with the provisions of Section 8.2;

(f)    by Buyer if the deadlines in Section 6.4(a) are not met;

(g)    by Buyer if the conditions to Buyer's obligations to close contained in Section 7.2 are not satisfied to the Buyer's satisfaction; or

(h)    by Seller if Buyer has not obtained financing on or before the date of the hearing on the Sale Motion.

8.2    Expense Reimbursement.

(a)    If this Agreement is terminated pursuant to Section 8.1(e), Seller shall pay in cash to Buyer in accordance with Section 8.2(b) and an amount equal to all actual Buyer Expenses as of the date of such termination up to a maximum of $200,000 (the "Expense Reimbursement"); provided, however, that the Expense Reimbursement shall not be payable to Buyer if this Agreement is terminated for any reason other than pursuant to Section 8.1(e).

(b)    The Expense Reimbursement shall be paid and payable as an actual damage, earned at the time of incurrence.  The Expense Reimbursement shall be paid to Buyer in lieu of any other payments or damages under this Agreement (except for the return of the Good Faith Deposit pursuant to Section 2.6).  The Expense Reimbursement shall be payable by Seller in the event and at the time a Competing Bid is consummated from the proceeds thereof or otherwise as provided by Section 8.2(c).

(c)    Seller's obligation to pay the Expense Reimbursement pursuant to this Section 8.2 shall survive termination of this Agreement and shall constitute an administrative expense (which shall be a superpriority administrative expense claim senior to all other administrative expense claims and payable out of Debtor's cash or other collateral securing Debtor's obligations to its secured lender(s), prior to any recovery by such lender(s)) of Debtor under section 364(c)(1) of the Bankruptcy Code.

8.3    Effect of Termination or Breach.  If the transactions contemplated hereby are not consummated (a) this Agreement shall become null and void and of no further force and effect, except (i) for this Section 8.3, (ii) for the provisions of Sections 2.6, 8.2, 10.1, 10.3, 10.6, 10.7, 10.8, 10.9, and 10.10 hereof, and (iii) that the termination of this Agreement for any cause shall not relieve any party hereto from any Liability which at the time of termination had already accrued

21

to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination; (b) the payment of the Expense Reimbursement and return of the Good Faith Deposit shall be sole and exclusive remedy (as liquidated damages) of Buyer; and (c) in the event this Agreement is terminated by Seller pursuant to <u>Section 8.1(d)</u>, the receipt by Seller of the Good Faith Deposit shall be the sole and exclusive remedy (as liquidated damages) of Seller.

## ARTICLE IX
## POST-CLOSING COVENANTS

9.1     <u>Employees</u>.  Buyer expects to offer employment immediately prior to the Closing (but contingent on the occurrence of the Closing) to such employees of Debtor actively employed or engaged principally in the Business as of the Closing Date as determined by Buyer in its sole discretion (such employees who accept such offer of employment, the "<u>Rehired Employees</u>") on terms and conditions as determined by Buyer in its sole discretion.  Nothing contained in this Agreement shall confer upon any Rehired Employee any right to any term or condition of employment or to continuance of employment by Buyer, nor shall anything herein interfere with the right of Buyer to terminate the employment of any employee, including any Rehired Employee, at any time, with or without notice and for any or no reason, or restrict in modifying any of the terms or conditions of employment of any employee, including any Rehired Employee, after the Closing.

9.2     <u>Employee Benefit Plans</u>.  Buyer shall not assume any Employee Benefit Plan or any Liability thereunder or related thereto and Buyer shall provide only those benefits to Rehired Employees as of or after the Closing as Buyer, in its sole discretion, shall determine.  Debtor shall be responsible for all obligations, Claims, or Liabilities at any time arising under or in connection with any Employee Benefit Plan.  Nothing contained in this Agreement, express or implied:  (a) shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement; (b) shall alter or limit the ability of Buyer to amend, modify or terminate any benefit or compensation plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them; or (c) is intended to confer upon any Person (including employees, retirees, or dependents or beneficiaries of employees or retirees) any rights as a third-party beneficiary of this Agreement.

9.3     <u>Access to Information</u>.  For a period of 180 days after the Closing Date, or longer to the extent necessary to respond to claims by Governmental Authorities or third parties, the Seller, Debtor, and Buyer and their respective representatives shall have reasonable access to, and each shall have the right to photocopy, all of the Books and Records relating to the Business or the Purchased Assets, including all employee records or other personnel and medical records required by Law, legal process or subpoena, in the possession of the other party to the extent that such access may reasonably be required by such party in connection or relating to the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities or Liabilities not assumed by Buyer.  Such access shall be afforded by the party in possession of such Books and Records upon receipt of reasonable advance notice and during normal business hours; <u>provided</u>, <u>however</u>, that (i) any such investigation shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party, (ii) no party shall be required to take any action which would constitute a waiver of the attorney-client privilege and (iii) no party need supply the other party with any information which such party is under a legal obligation not to supply.  The

22

party exercising this right of access shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 9.3.  If the party in possession of such Books and Records shall desire to dispose of any such Books and Records upon or prior to the expiration of such period, such party shall, prior to such disposition, give the other party a reasonable opportunity at such other party's expense, to segregate and remove such Books and Records as such other party may select.

9.4    Tax Matters.

(a)    Transaction Treatment; Allocation of Purchase Price.  Buyer and Seller hereby agree that the purchase price for Federal and state income tax purposes shall equal the Purchase Price ("Tax Purchase Price").  Buyer and Seller shall cooperate as provided herein in determining (in accordance with all applicable Treasury Regulations promulgated under Section 1060 of the Code) the allocation of the final Tax Purchase Price among the Purchased Assets (the "Allocation").  Within 60 days after the Closing, Buyer shall notify Seller and Debtor in writing of Buyer's proposed Allocation of the Tax Purchase Price among the Purchased Assets.  Seller and Debtor shall be deemed to have accepted such Allocation unless, within 30 days after the date Buyer provided the proposed Allocation to Seller and Debtor, Debtor notifies Buyer in writing of (a) each amount of the proposed Allocation with which Debtor disagrees and (b) for each such amount, the amount that Debtor proposes as the appropriate amount.  If Debtor provides such notice to Buyer, the parties shall proceed in good faith to resolve the amounts in dispute.  If they are unable to do so within 20 days after the delivery of Debtor's notice to Buyer, they shall retain a mutually acceptable independent accounting firm (with a valuation group) to do so, and the fees of such firm shall be paid 50% by Debtor and 50% by Buyer.  Neither Buyer nor Debtor shall take any position inconsistent with the Allocation as finally determined hereunder; provided, however, that (i) Buyer's cost for the Purchased Assets may differ from the Tax Purchase Price to the extent necessary to reflect Buyer's capitalized acquisition costs other than the Purchase Price and (ii) the amount realized by Seller may differ from the Tax Purchase Price to the extent necessary to reflect transaction costs that reduce the amount realized by Seller.

(b)    Tax-Sharing Agreements.    All tax-sharing agreements or similar agreements with respect to or involving Debtor shall be terminated as of the Closing Date and, on and after the Closing Date, the Buyer shall not be bound thereby or have any liability thereunder.

(c)    Cooperation.  Buyer, Debtor, and Seller jointly covenant and agree that, from and after the Closing Date, Buyer, Debtor, and Seller will each use commercially reasonable efforts to cooperate with each other in connection with any Proceeding of the other relating to (i) the preparation or audit of any Tax Return of Debtor or Buyer for periods prior to or including the Closing Date, (ii) any audit of Buyer and/or any audit of Debtor with respect to the sales, transfer and similar Taxes relating to the transactions contemplated by this Agreement or (iii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing involving Debtor.  In furtherance hereof, Buyer, Debtor, and Seller further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith.  All costs and expenses incurred in connection with this Section 9.4(c) referred to herein shall be borne by the party who is subject to such action.

23

9.5     Collections on Purchased Assets.  If, after the Closing Date, Debtor or Seller shall receive payment with respect to any Purchased Assets, the receiving party shall immediately deliver such funds or assets to Buyer and take all steps necessary to vest title to such funds or assets in Buyer.  If after the Closing Date, Buyer shall receive payment with respect to any Excluded Assets, Buyer shall immediately deliver such funds or assets to Seller and take all steps necessary to vest title to such funds or assets in Buyer.

9.6     Transfer Taxes.  Seller hereby agrees to pay any and all transfer, recordation, documentary, stamp or similar taxes assessed against either party hereto in connection with the transfer of the Real Property from Seller to Buyer.

9.7     Further Assurances.  From time to time after the Closing and without further consideration, (i) Seller and Debtor, upon the request of Buyer, shall take such actions and execute and deliver such documents and instruments of conveyance and transfer as Buyer may reasonably request in order to consummate more effectively the purchase and sale of the Purchased Assets as contemplated hereby and to vest in the Buyer title to the Purchased Assets transferred hereunder, or to otherwise more fully consummate the transactions contemplated by this Agreement and (ii) Buyer, upon the request of Seller, shall take such actions and execute and deliver such documents and instruments of contract or lease assumption as Seller may reasonably request in order to confirm Buyer's liability for the Assumed Liabilities or otherwise to more fully consummate the transactions contemplated by this Agreement.

## ARTICLE X
## MISCELLANEOUS

10.1     Expenses.  Except as provided in Section 8.2 hereof, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby.

10.2     Amendment.  This Agreement may not be amended, modified or supplemented except by a written instrument signed by Seller, Debtor, and Buyer.

10.3     Notices.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if delivered by hand (including by reputable overnight courier), (b) on the date of transmission if sent by facsimile or email (if the sender on the same day sends a confirming copy of such notice by reputable overnight courier) or (c) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

if to Seller, to:

John O. Desmond, Examiner
5 Edgell Rd., Ste. 30A
Framingham, MA
attorney@jdesmond.com

24

with a concurrent copy to Seller's counsel:

Kate E. Nicholson
Nicholson Devine LLC
21 Bishop Allen Dr.
Cambridge, MA 02139
kate@nicholsondevine.com

if to Debtor, to:

Neal Gouck
Freedom Wind Tunnel, LLC
200 Reservoir Street
North Attleboro, MA 02760

with a concurrent copy to Debtor's counsel:

Jesse I. Redlener
Ascendant Law Group LLC
2 Dundee Park Drive
Suite 102
Andover, MA  01810

if to Buyer, to:

Gordon M. Roberts, III, Manager
The Wind Tunnel Company, LLC
8869 Citation Road
Baltimore, MD  21221

with a concurrent copy to Buyer's counsel:

Michael E. Hastings
Woods Rogers Vandeventer Black PLC
10 S. Jefferson Street, Suite 1800
Roanoke, VA  24011

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

10.4    Waivers.  The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Seller, in the case of a waiver by Seller, or Buyer, in the case of any waiver by Buyer, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of

25

other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

10.5  Counterparts and Execution.  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

10.6  SUBMISSION TO JURISDICTION.  THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT FOR THE DISTRICT OF MASSACHUSETTS, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.

10.7  Governing Law; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the Laws of the Commonwealth of Massachusetts (regardless of the Laws that might otherwise govern under applicable Massachusetts principles of conflicts of Law) as to all matters, including matters of validity, construction, effect, performance and remedies.

EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, TRIAL BY JURY IN ANY PROCEEDING ARISING HEREUNDER.

10.8  Binding Nature; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other party (which shall not be unreasonably withheld or delayed).

10.9  No Third Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, Claims, or causes of action under or by reason of this Agreement.

10.10  Construction.  The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise.

10.11  Termination of Representations and Warranties.  All representations and warranties made by Seller, Debtor, and Buyer in this Agreement and in any certificate delivered pursuant to Section 3.3(a) or 3.4(d) shall terminate on the Closing Date upon the consummation of the transactions contemplated hereby, and none of Seller, Debtor, and Buyer shall have any liability after the Closing Date for any breach of any representation or warranty.

4892-8952-5732, v. 1

10.12   Public Announcements.   Except as required by Law or in connection with the Chapter 11 Case, none of Seller, Debtor, and Buyer shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, conditioned or delayed.   Prior to making any public disclosure required by applicable law, the disclosing parties shall give the other party a copy of the proposed disclosure and reasonable opportunity to comment on the same.

10.13   Entire Understanding.   This Agreement, the Exhibits and the Schedules set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement, the Exhibits and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

10.14   Severability.   If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable term, provision, covenant or restriction or any portion thereof had never been contained herein.

10.15   Headings.   The headings in this Agreement are inserted for convenience only and shall not constitute a part hereof.

10.16   No Liability of Officers and Directors.   The parties hereto acknowledge and agree that any individual executing this Agreement, or any certificates or other documents contemplated by this Agreement on behalf of Buyer, Debtor, or Seller do so on behalf of such entities and not in their individual capacities. As such, except for fraud, criminal act, or intentional, wrongful act or omission, no officer, director, employee, or agent of Buyer, Debtor, or Seller shall have any liability hereunder.

10.17   Specific Performance.   The parties hereto agree that irreparable damage would occur in the event any of the provisions of this Agreement to be performed at or prior to the Closing were not performed in accordance with the terms hereof and that, prior to the Closing, the parties shall be entitled to specific performance of such provisions, in addition to any other remedy at law or in equity.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**BUYER:**

THE WIND TUNNEL COMPANY, INC.

By: _____

Name:  Gordon Mac Roberts III

Its:  CEO

**SELLER:**

JOHN DESMOND, ESQ., solely in his capacity as Examiner

_____

John Desmond, Esq., solely in his capacity as Examiner

**DEBTOR**

FREEDOM WIND TUNNEL, LLC

By: _____

Name:

Its:

*[Signature page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**BUYER:**

THE WIND TUNNEL COMPANY, INC.

By: _____
Name:
Its:


**SELLER:**

JOHN DESMOND, ESQ., solely in his capacity as Examiner

_____
John Desmond, Esq., solely in his capacity as Examiner


**DEBTOR**

FREEDOM WIND TUNNEL, LLC

By: _____
Name:
Its:


*[Signature page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**BUYER:**

THE WIND TUNNEL COMPANY, INC.

By: _____
Name:  Gordon Mac Roberts III
Its:  CEO

**SELLER:**

JOHN DESMOND, ESQ., solely in his capacity as Examiner

_____
John Desmond, Esq., solely in his capacity as Examiner

**DEBTOR**

FREEDOM WIND TUNNEL, LLC

By: _____
Name:
Its:      CEO, Neal Gouck

*[Signature page to Asset Purchase Agreement]*

## <u>Schedule 2.1(a)</u>

## Assumed Leases

1. *Ground Lease, Covenant and Agreement between NPP Development LLC, as Landlord and Freedom Wind Tunnel LLC, as Tenant*, dated July 2, 2019, and all amendments, modifications and extensions.

## <u>Schedule 2.1(d)</u>

## Claims and Causes of Action

1. Claims and causes of action against Erland Construction Inc., for damages pertaining to schedule delays, breach of contract, defective and nonconforming work, and breach of contract;

2. Claims against NPP Development LLC, NPP Development Holdings LLC, Kraft Group LLC, Kraft Enterprises LLC, and Kraft Family Inc. for willful misconduct and gross negligence;

3. Claims National Grid for damages arising from breach of contract.

4. Any claims of Debtor against counterparties to any Assumed Contract or Assumed Lease.

5. Any insurance claims of Debtor involving products or services arising out of or in connection with the Project or the Business.

## <u>Schedule 2.1(e)</u>

## Intellectual Property

1.  The Debtor's domain name:  [www.freedomwindtunnel.com](www.freedomwindtunnel.com)

## Schedule 2.1(f)

## Assumed Contracts

1. *Freedom Wind Tunnel Timeline and Payment Schedule: Appendix #1A*, dated 4/18/2018, between Freedom Wind Tunnel and STI Inc.

2. *Accepted Proposal for Air-Cooled Helical Rotary Water Chiller*, dated December 30, 2021, between Freedom Wind Tunnel and Trane U.S. Inc.

3. *Employment Agreement, dated November 8, 2022*, between Freedom Wind Tunnel and Ty Swansboro.

4. *Employment Agreement, dated November 8, 2022*, between Freedom Wind Tunnel and Courtney McCarthy.

5. *Confidentiality, Proprietary Information and Non-Competition Agreement*, dated November 8, 2022, between Freedom Wind Tunnel and Ty Swansboro.

6. *Confidentiality, Proprietary Information and Non-Competition Agreement*, dated November 8, 2022, between Freedom Wind Tunnel and Courtney McCarthy.

7. *Consulting Agreement,* dated January 1, 2019, between Freedom Wind Tunnel and DEO Associates.

8. *Construction Manager Contract*, dated February 8, 2021, between Freedom Wind Tunnel and Erland Construction Inc.

9. *[insert name of contract]*, dated [insert date], between Freedom Wind Tunnel and Alesco Delegated Authority.

10. *Standard Form of Agreement Between Owner and Architect*, dated February 12, 2021, between Freedom Wind Tunnel and AHP Architect.

11. *Agreement for Owner's Representation Services*, dated August 3, 2022, between Freedom Wind Tunnel and Alares Architects & Engineers.

12. *Field Service Agreement*, October – November 2023, between Freedom Wind Tunnel and Eagle Engineering Corporation.

13. *Insurance Premium Finance Agreement,* between Freedom Wind Tunnel and First Insurance.

14. Contract for services between Freedom Wind Tunnel and Martins Electric LLC.

15. *Electric Service Proposal 30509850* between Freedom Wind Tunnel and National Grid.

16. *Accepted Proposal for Phase 2 of Chilled Water System and Condensate Spray Piping*, dated May 31, 2023 between Freedom Wind Tunnel and Premier Mechanical.

17. *Sale Purchase Agreement for Vertical Wind Tunnel (SPA),* dated January 22, 2019, as amended on July 10, 2019, between Freedom Wind Tunnel and Vertical DWC LLC.

# **Schedule 2.3**

## **Assumed Liabilities**

To be determined

# EXHIBIT A

## Bill(s) of Sale

To be determined

# EXHIBIT B

## Assignment and Assumption

To be provided

# EXHIBIT C

## Intellectual Property Assignment

To be provided

# <u>EXHIBIT D</u>

## Transition Services Agreement

To be provided

# EXHIBIT E

## Assignment and Assumption Agreement

To be provided

**Exhibit 2**

**(Bidding Procedures)**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | **Chapter 11** |
| **FREEDOM WIND TUNNEL, LLC,** | ) | **Case No. 24-10082-CJP** |
| | ) | |
| Debtor. | ) | |
| | ) | |

## BIDDING PROCEDURES

These bidding procedures (the "**Bidding Procedures**") have been approved by an order of the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**") entered on [date], [Docket No. _____] (the "**Bidding Procedures Order**") on the docket in the above-captioned case of Freedom Wind Tunnel, LLC (the "**Debtor**"). The Bidding Procedures set forth the process by which the Examiner is authorized to conduct the sale (the "**Sale**") by auction of the Purchased Assets, as defined in that certain Asset Purchase Agreement (the "**Purchase Agreement**") by and between the Examiner, Debtor, and The Wind Tunnel Company, LLC, as stalking horse purchaser (the "**Purchaser**").

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT THE EXAMINER'S ADVISORS, AS FOLLOWS:**

- BROKER: Hill View Partners, attention: Arthur Petropoulos (arthur@hillviewps.com; 401-569-9136)

- EXAMINER'S COUNSEL: Kate E. Nicholson (kate@nicholsondevine.com; 857-600-0508)

### Notice

1.     The Examiner shall provide notice of the Bidding Procedures and the date for a hearing to approve the sale of the Assets (the "**Sale Hearing**"), together with a copy of the Purchase Agreement, to all parties identified by the Examiner as potentially having an interest in acquiring the Assets in accordance with the Bidding Procedures Order.

### Due Diligence

2.     Parties interested in conducting due diligence should contact the Examiner's broker, Hill View Partners ("**Hill View**") attention Arthur Petropoulos at (401) 569-9136 or arthur@hillviewps.com. Prospective bidders that have executed an appropriate confidentiality agreement will be afforded access to a virtual proprietary data room containing information relating to the Assets. The Debtor, Examiner, and Hill View maintain the right to deny access to

the proprietary data room to any party, in their discretion, including, without limitation, on the basis that such party might use such proprietary information in a competitive manner to the detriment of the Debtor, the Purchaser, or the Successful Bidder (defined below). The Debtor, Examiner and Hill View shall not be obligated to furnish any due diligence information other than that information contained in the proprietary data room or after the Bid Deadline (defined below).

3.      Each party submitting a bid (each, a "**Potential Bidder"**) and Qualified Bidder (defined below) shall comply with all reasonable requests for additional information and due diligence access by the Examiner or his advisors. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Examiner to determine that such bidder is not a Qualified Bidder. Failure by a Qualified Bidder (other than the Purchaser) to comply with requests for additional information and due diligence access may be a basis for the Examiner to determine that a bid made by such Qualified Bidder is not a Qualified Bid (defined below).

**Qualified Bid Requirements**

4.      To be considered, any bid submitted by a Potential Bidder for the Assets must include language:

(a)      stating that the bid is irrevocable through the Auction (defined below), provided, however, that (i) if the Qualified Bid (defined below) becomes the Successful Bid (defined below), such bid shall be irrevocable through the closing date or such earlier date as the Purchase Agreement may be terminated in accordance with its terms.

(b)      stating that the Potential Bidder (i) has had an opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures;

(c)      stating that the Potential Bidder has obtained all necessary organizational approvals to make its competing bid and to enter into and consummate the transaction set forth in the Purchase Agreement and to acquire the Assets; and

(d)      be submitted in writing to (i) counsel for the Examiner, Nicholson Devine LLC, 21 Bishop Allen Dr., Cambridge, MA   02139 (Attn: Kate E. Nicholson, kate@nicholsondevine.com); (ii) broker for Examiner, Hill View Partners, 220 South Main Street, Providence, RI  02903 (Attn:  Arthur Petropolous, arthur@hillviewps.com); and (iii) counsel to the Purchaser, Woods Rogers Vandeventer Black PLC, 10 S. Jefferson Street, Suite 1800, Roanoke, VA   24011 (Attn: Michael E. Hastings, michael.hastings@woodsrogers.com), so as to be received no later than [____]at [TIME] [a.m./p.m.] (Prevailing Eastern time) (the "**Bid Deadline"**).

5.      In addition to the foregoing, a "**Qualified Bidder**" is a Potential Bidder that delivers a binding bid that satisfies the requirements in paragraph 6(a) – (j) below ("**Qualified Bid**").

6.      A Qualified Bid is one that satisfies the following:

(a)      is based on the Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such bidder, pursuant to which the bidder proposes to effectuate an Alternative Transaction (the "**Modified Purchase Agreement**"). The bid must also include a copy of the Purchase Agreement marked against the Modified Purchase Agreement to show all changes requested by the Bidder, including any contracts and leases of the Debtor that would be assumed and assigned in connection with the Alternative Transaction (a Word document of the Purchase Agreement will be made available for this purpose);

(b)      is on the same (or better) terms and conditions as those set forth in the Purchase Agreement, including without limitation, with respect to certainty of closing;

(c)      is for a price and under terms which the Examiner believes to be higher or better than the Purchaser's bid;

(d)      the "**Cash Component**" of the bid, defined as the total consideration less any amounts paid to cure defaults under assumed contracts and/or leases, must be equal to or greater than the sum of: (i) $200,000; (ii) the Expense Reimbursement of $200,000 (as defined in the Motion) and (iii) $50,000 (the sum of which shall be the incremental Cash Component bid amount);

(e)      is accompanied by a deposit (the "**Bid Deposit**") in an amount equal to at least $200,000 plus 5% of the Cash Component over $200,000 proposed by the Potential Bidder, in the form of a certified check or cash deposit made out to John O. Desmond, Examiner of Freedom Wind Tunnel, as escrow agent;

(f)      is accompanied by sufficient information, including to demonstrate, in the Examiner's discretion, that the Potential Bidder has the financial ability to timely consummate the Alternative Transaction, for instance current bank account statements, current audited financial statements, commitments or other proof of available financing, and such other forms of financial disclosure and credit quality in support of such Potential Bidder (including financial information from any entities that will finance or guarantee the obligations of such Potential Bidder);

(g)      is accompanied by sufficient information, including to demonstrate, in the Examiner's discretion, that the Potential Bidder has the ability to promptly cure and provide adequate assurance of future performance of all contracts or leases to be assumed and assigned under the Alternative Transaction, including to satisfy the enforceable requirements to be an assignee under the Debtor's nonresidential real property lease with NPP Development, LLC for the property at 21 Patriot Place, Foxboro, MA.

(h)     provides for the closing of such transaction within approximately the same time period proposed in the Purchase Agreement;

(i)     is firm and unconditional and not subject to any contingencies that are not also applicable to the Purchase Agreement;

(j)     acknowledges in writing that the Potential Bidder (i) has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any bids for the Assets or any Alternative Transaction; (ii) did not agree with any Potential Bidders or Qualified Bidders to control price; and (iii) agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any bids, the Auction, or the Sale.

7.     Notwithstanding the forgoing, Hanscom Federal Credit Union, the Debtor's secured lender, shall be deemed a Qualified Bidder and shall be entitled to credit bid its claim at the Auction.

8.     The Examiner shall not be required to consider any Bids received after the Bid Deadline. Following entry of the Bidding Procedures Order, the Examiner, in his sole and absolute discretion after consultation with his professionals, may reject any competing bid that is on terms that are more burdensome or conditional than the terms of the Purchase Agreement; requires any indemnification of the Potential Bidder other than as set forth in the Purchase Agreement; is contingent on receiving uncommitted funds from a governmental authority; entitles the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment; is not in conformity with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Local Bankruptcy Rules of the Bankruptcy Court; is from an entity that the Examiner, in his sole and absolute discretion, concludes does not have the financial ability to consummate the transaction or fulfill all of the commitments under their proposal; or is contrary to the best interests of the Debtor's estate.

9.     For purposes of valuing Qualified Bids, the full face amount of any credit bid will be deemed to have the same value as the equivalent amount of cash (whether the credit bid provides for cash payment or the assumption of secured debt) provided that any credit bid must include sufficient cash to satisfy liens, claims, and any other amounts that are deemed to be senior in priority to the liens securing the assets of the party submitting the credit bid.

10.     The Examiner may, in his sole and absolute discretion, communicate prior to the Auction or Sale Hearing with any Potential Bidder and may request any additional information reasonably required by the Examiner in connection with the Examiner's evaluation of such Potential Bidder's bid.

11.     Within three (3) business days after the Bid Deadline, the Examiner shall inform each Potential Bidder that has submitted a bid whether it is a Qualified Bidder and shall contemporaneously advise the Purchaser of such determination(s). As soon as reasonably practicable after the Bid Deadline, but in any case, no later than two (2) days prior to the Auction, the Examiner shall provide all Qualified Bidders with a copy of all Qualified Bids received to date.

12.     The Purchase Agreement executed by the Purchaser is a Qualified Bid and the Purchaser is a Qualified Bidder for all purposes, provided, however, notwithstanding anything herein to the contrary, the bid of the Purchaser shall terminate only in accordance with the Purchase Agreement.

## Sale to The Purchaser

13.     If (a) no Qualified Bids have been submitted (other than that submitted by the Purchaser) by the Bid Deadline or (b) the aggregate value of the highest Qualified Bid submitted by the Bid Deadline for the Assets is for a price and under terms which the Examiner believes to not be higher or better than the purchase price in the Purchase Agreement, the Examiner may report the same to the Bankruptcy Court and shall proceed to seek approval of the Purchase Agreement and the transaction contemplated thereby.

## Auction

14.     If the value of the highest or best Qualified Bid submitted (other than that submitted by the Purchaser) by the Bid Deadline for the Assets (as determined by the Examiner in his sole and absolute discretion) is for a price and under terms the Examiner believes to be higher or better than the purchase price set forth in the Purchase Agreement or the Examiner determines (in his sole and absolute discretion) that it is in the best interests of the Debtor's estate, an auction (the "**Auction**") for the Assets will take place on a date to be determined by the Bankruptcy Court and set forth in the Bidding Procedures Order.

15.     Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction. The Examiner will evaluate all Qualified Bids received and, after consultation with his professionals, will select the Qualified Bid that reflects the highest or best offer for the Assets as the "**Starting Auction Bid.**" In considering which Qualified Bid shall be the Starting Auction Bid, the Examiner will consider, among other things, the Qualified Bid, the changes to the Purchase Agreement required by the Qualified Bid, and the Qualified Bidder's ability to finance and timely consummate the purchase of Assets.

16.     For the avoidance of doubt, the Purchaser shall be permitted to include the full amount of the Expense Reimbursement in each bid by the Purchaser for the purposes of comparison to any overbid in connection with each round of bidding in the Auction.

17.     The following rules shall apply at the Auction: (a) the minimum initial overbid(s) must be, in the aggregate, at least $50,000 in cash greater than the Starting Auction Bid(s), (b) subsequent overbids must be, in the aggregate, in increments of at least $50,000 unless otherwise defined by the Examiner in his sole discretion. From time to time, the Examiner will, in an open forum, advise Qualified Bidders participating in the Auction of his determination as to the terms of the then highest or otherwise best bid for the Assets. The Examiner shall also consider the impact of the Expense Reimbursement and the potential costs of satisfying the conditions of any bid.

18.     An overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any overbid must remain open and binding on the Qualified Bidder until and unless the Examiner accepts a higher or

otherwise better overbid from another bidder. To the extent not previously provided, a Qualified Bidder submitting an overbid at the Auction must submit, as part of its overbid, written evidence (in the form of financial disclosure or credit quality support information or enhancement reasonably acceptable to the Examiner) demonstrating such Qualified Bidder's ability to close the Alternative Transaction proposed by such overbid.

19.    Subject to the Purchase Agreement, the Examiner, in his sole and absolute discretion after consultation with his professionals, may adopt other rules for the Auction at the Auction that, in his reasonable judgment, will better promote the goals of the Auction. All such rules will provide that: (a) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder and (b) all bids shall be made and received in one room, on an open basis, and all bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Qualified Bid shall be fully disclosed to all other bidders throughout the entire Auction. Nothing herein shall prohibit the Examiner from meeting privately with any Qualified Bidder to negotiate the terms of a bid or overbid.

20.    During the Auction, the Examiner will review each bid or overbid submitted by a Qualified Bidder to identify, in his sole and absolute discretion after consultation with his professionals, the bid or overbid that constitutes the highest or otherwise best bid for the Assets. The Examiner will consider, among other things, (a) the amount of consideration offered under the Qualified Bid; (b) the changes to the Purchase Agreement required by the Qualified Bid; and (c) the Qualified Bidder's ability to finance and timely consummate the purchase of the Assets. The Examiner will also consider the Qualified Bid's impact on the ability to minimize the Debtor's losses incurred before the closing date based on the terms and timing provided in the bid.

21.    The Auction shall continue until there is only one Qualified Bid for the Assets that the Examiner determines, in his reasonable business judgment, after consultation with his advisors, is the highest or otherwise best Qualified Bid at the Auction for the Assets. The bid that is selected by the Examiner as the highest or otherwise best bid for the Assets will be considered the "**Successful Bid**" and such bidder the "**Successful Bidder**." Promptly following the Examiner's selection of the Successful Bid and the conclusion of the Auction (and in no event later than one (1) business day after the close of the Auction), the Examiner shall announce the Successful Bid and Successful Bidder.

22.    The Examiner, the Purchaser, and any other Qualified Bidder, in each case, along with its representatives, advisors, and counsel, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any bids at the Auction.

23.    Any bid submitted after the conclusion of the Auction shall not be considered for any purpose unless an order of the Bankruptcy Court is entered directing that such bid be considered, and neither the Examiner nor any other person shall have any obligation to seek such an order from the Bankruptcy Court.

**Backup Bid**

24.     With the consent of the Second Highest Bidder (as defined below), the second highest or otherwise best bid (the "**Second Highest Bid**" and such bidder, the "**Second Highest Bidder**"), as determined by the Examiner at the conclusion of the Auction and approved by the Bankruptcy Court at the Sale Hearing, shall remain open and irrevocable through the closing of the sale of the Assets to the Successful Bidder. In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by its Successful Bid, the Examiner, in his sole and absolute discretion, may elect to regard the Second Highest Bid as the highest or best bid for the Assets, and the Examiner will be authorized to consummate the transaction contemplated by the Second Highest Bid without further order of the Bankruptcy Court. The Examiner may not compel the Purchaser to serve as the Second Highest Bidder without the Purchaser's express written consent.

**The Sale Hearing and Return of Deposits**

25.     The Sale Hearing will be held at a date and time established by the Bankruptcy Court in the Bidding Procedures Order. At the Sale Hearing, the Examiner will seek entry of a Sale Order, among other things, authorizing and approving the sale of the Assets: (a) if no Auction is held or if the Purchase Agreement is the Successful Bid, with the Purchaser pursuant to the terms and conditions set forth in the Purchase Agreement, or (b) if a Qualified Bid other than the Purchase Agreement is determined by the Examiner after the Auction to be the Successful Bid, with the Successful Bidder pursuant to the terms and conditions set forth in the Successful Bid. Subject to the Purchase Agreement and the terms of the Successful Bid, the Sale Hearing may be adjourned or rescheduled at the Examiner's sole and absolute discretion, and the Examiner will notify all relevant parties of such adjournment or rescheduling in an appropriate manner, including by an announcement of the adjourned date at the Sale Hearing.

26.     No offer shall be deemed accepted by the Examiner unless and until it is approved by the Bankruptcy Court.

27.     In the event the Purchaser or any Successful Bidder fails to consummate the purchase of the Assets because of a breach or failure to perform on the part of such bidder, the bidder's Bid Deposit shall be forfeited to the bankruptcy estate provided that the Examiner reserves the right to seek all available damages from the defaulting bidder, provided, however, that in the case of the Purchaser's Bid Deposit, the treatment thereof shall be governed by the terms of the Purchase Agreement and the Examiner's right to seek additional damages will be subject to the terms of the Purchase Agreement.

28.     All Bid Deposits, other than the Bid Deposit of the Successful Bidder and the Second Highest Bidder, will be returned within five (5) business days following entry of the Sale Order. The Bid Deposit of the Second Highest Bidder will be returned as soon as practicable following the closing of the sale with the Successful Bidder pursuant to the Successful Bid, unless the Examiner has elected to regard the Second Highest Bid as the highest or best bid for the Assets, as described above. Except as otherwise provided in the Purchase Agreement, the Examiner will not be required to maintain any Bid Deposit in an interest-bearing account, but any interest earned on any Bid Deposit will be remitted to the appropriate Qualified Bidder if the Bid Deposit is

returned to the Qualified Bidder pursuant to the above. Subject to the Purchase Agreement in the case of the Purchaser's Bid Deposit, Bid Deposits may only be used in accordance with the terms of these Bidding Procedures. Neither the Examiner nor the Purchaser shall have any liability with respect to any Bid Deposit.

## Expense Reimbursement

29.     Pursuant to the Bidding Procedures Order, the Purchaser is entitled to the Expense Reimbursement in accordance with the terms of the Purchase Agreement and the Bidding Procedures Order.  No break-up fee is being offered.

30.     Pursuant to the Bidding Procedures Order, except for the Purchaser, no other party submitting an offer or bid or a Qualified Bid shall be entitled to any expense reimbursement or breakup, termination, or similar fee, or postpetition claim, including any administrative expense claim or substantial contribution claim under section 503 of the Bankruptcy Code or otherwise, and by submitting a bid, a Bidder (other than the Purchaser) shall be deemed to waive any right with respect thereto.

## Jurisdiction

31.     The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale, the Bidding Procedures, the Sale Hearing, the Auction, the Purchase Agreement, any Modified Purchase Agreement, and/or any other matter that in any way relates to the foregoing.

32.     All Potential Bidders and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating the Sale, the Bidding Procedures, the Sale Hearing, the Auction, the Purchase Agreement, any Modified Purchase Agreement, and/or any other matter that in any way relates to the foregoing, as applicable.

## Reservation of Rights

33.     By proposing these Bidding Procedures, the Examiner does not desire and does not intend in any way to derogate from or diminish the fiduciary duties of the Debtor to act in the best interests of the estate.

**EXHIBIT B**
**(Proposed Bidding Procedures Order)**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: | ) |
| | ) |
| | )    CHAPTER 11 |
| FREEDOM WIND TUNNEL, LLC | )    CASE NO. 24-10082-CJP |
| | ) |
| DEBTOR | ) |
| | ) |

**[PROPOSED] ORDER APPROVING BIDDING PROCEDURES**

Upon the motion of John O Desmond, chapter 11 examiner in the case of Freedom Wind

Tunnel LLC ("Examiner"), pursuant to Sections 105(a), 363, and 365 of title 11 of the United

States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6004 and 9007

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order (A)

approving and authorizing bidding procedures in connection with the sale of substantially all the

assets of Freedom Wind Tunnel LLC ("Debtor"); (B) approving and authorizing the expense

reimbursement, (C) scheduling the related auction and hearing to consider approval of the sale,

(D) approving the form and manner of notice thereof; and (F) granting related relief; and (II) an

order (A) authorizing the sale of substantially all of the Debtor's assets free and clear of liens,

claims and encumbrances and other interests, (B) authorizing and approving the seller's

performance under the asset purchase agreement, (C) approving certain sale-related charges, and

(D) granting related relief [Doc. No. _] (the "Sale Motion"); and the Sale Motion requesting,

among other things, that this Court (i) approve a sale of substantially all of the assets ("Assets")

of Freedom Wind Tunnel, LLC ("Debtor") to the bidder making the highest and best offer at the

proposed Auction[1]; (ii) approve certain Bidding Procedures governing the sale of the Assets by

---

[1] Capitalized terms not defined herein have the same meaning attributed to them in the Sale Motion.

the Examiner and other relief regarding the sale process; (iii) schedule the Sale Hearing (as

defined below); and (iv) approve the form and manner of notice of the Sale Motion and the Sale

Hearing; and the Court having reviewed the pleadings filed by the Examiner; and any objections

filed having been resolved, withdrawn, or overruled; after a hearing regarding the Bidding

Procedures held on _____ (the "Bidding Procedures Hearing"); and the Court

having found and determined that the relief sought in the Sale Motion as to the Bidding

Procedures is in the best interests of the bankruptcy estate of the Debtor and its creditors and all

parties in interest, and that the legal and factual bases set forth in the Sale Motion and at the

Bidding Procedures Hearing establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefore,

IT IS HEREBY FOUND AND CONCLUDED THAT:

A.      This Court has jurisdiction over the Assets and all other assets of the Debtor and

its chapter 11 estate, pursuant to 28 U.S.C. §§ 157(a) and 1334, and has jurisdiction to consider

the Sale Motion.

B.      The Sale Motion is a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Venue

of the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory and legal predicates for the relief requested in the Sale Motion and

provided for herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules

2002, 6004 and 9007, and Local Rule 6004-1.

D.      The Examiner has given due and proper notice of the Sale Motion, the Bidding

Procedures Hearing, and the Bidding Procedures attached as Exhibit 2 to the Sale Notice. The

notice of and opportunity to be heard with respect to the Bidding Procedures and the Notice of

Sale, the form of which is attached as Exhibit A to the Sale Motion (the "Sale Notice"), was

proper, timely, and sufficient, and meets the requirements of the Bankruptcy Code, the

Bankruptcy Rules and the Local Rules.  The Sale Notice is reasonably calculated to give actual

notice of the relief contemplated hereby, the Bidding Procedures, the Auction, the Sale, and the

Sale Hearing, and any and all objection deadlines related thereto, is appropriate under the

circumstances, and no further notice is required. A reasonable opportunity to object or be heard

regarding the relief granted by this Order has been afforded to those parties entitled to notice.

E.      The approval of the Bidding Procedures is in the best interest of the bankruptcy

estate, the Debtor's creditors, and other parties in interest. The Examiner's determination to

propose to such provisions is within the authority and the reasonable business judgment of the

Examiner.  The Bidding Procedures are fair and reasonable and reasonably calculated to enhance

the process of competitive bidding for the Assets and to maximize recovery with respect to the

Debtor's estate.  The Bidding Procedures are beneficial to the bankruptcy estate and all interested

parties.

THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The relief sought regarding the bidding procedures portion of the Sale Motion is

granted as set forth herein. The Bidding Procedures shall be, and hereby are, approved. The

Trustee is hereby authorized to conduct the Auction pursuant to the terms of the Bidding

Procedures and this Order.

2.      To the extent that there is any conflict between the provisions of this Order and

the provisions of the Sale Motion or the Agreement, the terms of this Order shall control.

3.      The Sale Notice, as such notice may be amended appropriately to conform with

the provisions of this Order, shall be, and hereby is, approved.

**<u>Qualified Bidders; Sale Hearing</u>**

3

4.      The Examiner is authorized to solicit higher and better offers for the Assets in accordance with the Bidding Procedures.

5.      As provided in the Sale Notice, the hearing on approval of the Sale Motion is scheduled to take place on_____ at _____ (prevailing Eastern Time) (the "Sale Hearing") before the Honorable Christopher J. Panos at the United States Bankruptcy Court for the District of Massachusetts, John W. McCormack Post Office and Courthouse, 5 Post Office Sq., 12th Floor, Courtroom 1, Boston, MA 02109.

6.      If the Examiner has received a Qualifying Bid, as set forth in the Bidding Procedures, an Auction of the Assets will be held at the time and place of the Sale Hearing.

7.      The Sale Hearing may be adjourned or rescheduled without further notice except by an announcement of the adjourned date at the Sale Hearing.

**Sale Objections**

8.      As provided in the Sale Notice, objections or responses to the Sale Motion (except as related to this Order) and/or the Agreement, if any, must be filed with the Office of the Clerk of the Bankruptcy Court John W. McCormack Post Office and Courthouse, 11th floor, 5 Post Office Sq., Boston, MA 02109 on or before _____ at _____(prevailing Eastern Time) (the "Objection Deadline").  Any such objection shall be served on the Examiner and any other notice parties as set forth in the Sale Notice and Bidding Procedures so as to be received by such parties no later than the Objection Deadline.

**Notices**

9.      Within two (2) business days following entry of this Order, the Examiner will serve a copy of this Order to the notice parties as set forth in the Sale Motion.

4

10.     The form and manner of notice set forth herein are reasonable and sufficient to provide effective notice to all interested parties and shall be, and hereby are, approved as sufficient notice of the Bidding Procedures, and all relief contemplated thereby.

**<u>Other Matters</u>**

11.     Notwithstanding the applicability of Bankruptcy Rules 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry by the Court.

12.     This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order.

_____
Christopher J. Panos
United States Bankruptcy Judge

DATED: